STATE OF MISSOURI, Appellant,

v.

NATIONAL ORGANIZATION FOR WOMEN, INC., Appellee.

No. 79–1379.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 7, 1979.

Decided March 28, 1980.

Roger Bern, Asst. Atty. Gen., Jefferson City, Mo., for appellant; John Ashcroft, Atty. Gen., Walter O. Theiss, Gregory D. Hoffmann and Nanette Laughrey, Asst. Attys. Gen., Jefferson City, Mo., on brief.

John E. Vanderstar, Covington & Burling, Washington, D. C., for appellee; David J. Cynamon, Clare Dalton and Donna L. Kohansky, Washington, D. C., Betty K. Wilson, Welliver, Atkinson & Eng, Columbia, Mo. and Phyllis Segal, Legal Director, NOW Legal Defense & Ed. Fund, New York City, on brief.

Bruce V. Bordelon, Ruth Bader Ginsburg, Columbia University School of Law, William J. Hibsher and Jo-Ann H. Whitehorn, New York City, on brief of amicus curiae, Special Committee on Sex and Law.

Nathan Z. Dershowitz and Joseph B. Robison, American Jewish Congress, New York City, Marilyn Berner, Judith E. Diamond, Carolynn N. Fischel, Boston, Mass., Daniel J. Landau, Concord, Mass., Mark Michelson and Alexandra Moses, Boston, Mass., on brief of amicus curiae, American Jewish Congress.

Ellen Broadman and Alan Mark Silbergeld, Washington, D. C., on brief of amicus curiae, Consumers Union.

Dian D. Ogilvie and Vicki E. Land and Marjorie S. Steinberg, Los Angeles, Cal., on brief of amicus curiae, California Women Lawyers, et al.

Philip Elman, Toni G. Allen and Nancy H. Hendry, Wald, Harkrader & Ross, Washington, D. C., David R. Morris, Kansas City, Mo., Diana A. Steele, American Civil Liberties Union, and Women's Equity Action League, New York City, on brief of amicus curiae, American Civil Liberties Union, et al.

Harold Baer, Jr., President, New York County Lawyers' Ass'n, New York City and Margaret H. McDowell, Chairperson, Rochelle M. Corson, Susan B. Lindenauer and Joan Offner, Special Committee on Women's Rights, New York City, on brief of amicus curiae, N. Y. County Lawyers Ass'n.

Before GIBSON, Chief Judge,* STEPHENSON and HENLEY, Circuit Judges.

STEPHENSON, Circuit Judge.

This case poses serious questions concerning the First Amendment's right of petition and the scope of the antitrust laws. The primary question with which we must deal is the applicability of the Sherman Act to a politically motivated but economically tooled boycott participated in and organized by noncompetitors of those who suffered as a result of the boycott.

Essentially, the National Organization for Women, Inc., (NOW) organized a convention boycott against all states that had not ratified the proposed Equal Rights Amendment (ERA).[1] The impact was such that the Missouri motels and restaurants catering to the convention trade, and the Missouri economy as a whole, were suffering revenue losses. Missouri asked for injunctive relief against NOW's activities under section 16 of the Clayton Act, 15 U.S.C. § 26, which the district court[2] denied. The

court, in a well-reasoned opinion, found, primarily on the basis that NOW's activities were political and thus not within the scope of the Sherman Act, that NOW had not violated section 1 of the Sherman Act, 15 U.S.C. § 1. *Missouri v. National Organization for Women, Inc.*, 467 F.Supp. 289 (W.D. Mo.1979).

Because we hold that it was not the intent of Congress that the Sherman Act cover such activities, we affirm the district court.

I.  Background

The district court opinion thoroughly sets out the factual circumstances of this case.[3] A skeletal summary of the facts most relevant (borrowing generously from the district court's language) is as follows:

(1) "NOW actively engaged in an 'economic boycott campaign' that has been a significant part of and shared common goals with a larger convention boycott movement directed at unratified states," *id.* at 293;

(2) The convention boycott takes place in what is essentially a political context;

(3) The goal and sole purpose of NOW's economic boycott campaign is the ratification of the ERA;

(4) The motivation of NOW can be viewed from two points, both aimed directly at the legislative process:

(a) a desire to make a symbolic gesture; and

(b) a desire to attract attention and bring public visibility to the issue of ratification;

---

* The Honorable Floyd R. Gibson was Chief Judge of the Eighth Circuit at the time this case was submitted and took senior status on December 31, 1979, before the opinion was filed.

1.  The proposed twenty-seventh amendment to the United States Constitution reads as follows:

   Section 1.  Equality of rights under the law shall not be denied or abridged by the United States or by any State on account of sex.
   Section 2.  The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

   Section 3.  This amendment shall take effect two years after the date of ratification.

2.  The Honorable Elmo B. Hunter, United States District Judge for the Western District of Missouri.

3.  The district court's full discussion of the facts is found in *Missouri v. National Organization for Women, Inc.*, 467 F.Supp. 289 (W.D.Mo. 1979).

(5) NOW also intended that the adverse economic impact of the boycott on those who would otherwise profit from conventions in Missouri would cause those persons to influence their legislators to support ERA ratification;

(6) The boycott and related activities were not intended as punitive for Missouri's past failure to ratify; and

(7) NOW was not motivated by any type of anticompetitive purpose;

(8) The participants are not in a competitive relationship with Missouri—which has suffered as a result of the boycott.

The district court concluded that:

(9) The boycott is noncommercial in that its participants are not business interests and its purpose is not increased profits;

(10) The boycott is "non-economic" as it was not undertaken to advance the economic self-interests of the participants;

(11) Assuming arguendo that the actions taken by NOW fall within the purview of the Sherman Act,

  (a) NOW entered into a combination to implement a boycott of unratified states; and

  (b) "the invitation to act, the presence of a strong motive for concerted action, and the knowledge that others were taking similar action are sufficient to find conspiracy under the Sherman Act." *Id.* at 296.

Standing for Missouri to bring a cause of action under 15 U.S.C. § 26 was based on the fact that:

(12) "[T]he businesses of Missouri's convention industry have suffered economic injury as a result of the boycott and are threatened with additional injury in the future," *id.* at 300;

(13) "The adverse effect of the injury extends to all parts of the economy of the state," *id.*;

(14) NOW's target is the state legislature,. the supreme policy-making body of the state.

The court concluded:

(15) Missouri has standing as *parens patriae* as this is a case in which the state is seeking to protect the public interest.

The court cautioned, in connection with its determination of standing *parens patriae* :

(16) It must be noted that this conclusion is the result of a consideration of the economic and policy factors in this case. This opinion is not to be read as a general approval of *parens patriae* standing as a matter of law in any case in which the state adduces expert testimony to show generalized economic injury due to linkage or interdependence among the various sectors of the state's economy.

*Id.* at 301.

Further, in a footnote the court stated:

(17) NOW argues that "[a]cceptance of the state's theory [of economic linkage causing damage to the general economy] would give the state standing to sue in every case where any Missouri business claims injury by reason of any tort, including violations of antitrust laws, or presumably even in ordinary breach of contract cases." * * * The Court shares this concern and notes that the economic interdependence rationale for *parens patriae* standing cannot be viewed in isolation or accepted as the sole justification for state standing. To do so would carry the doctrine of *parens patriae* far beyond its proper bounds.

*Id.* at 301 n. 22.

The court also discussed the case of *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). The court stated:

(18) "The 'essential dissimilarity' between the convention boycott directed at the legislatures of unratified states and agreements traditionally held violative of § 1 of the Sherman Act is of a greater magnitude in this case than that in *Noerr*," *id.* at 304;

(19) "The Supreme Court's reasons for nonapplication of the antitrust laws in

*Noerr* apply with greater weight to this case, which involves political opponents, not commercial competitors; and political objectives, not market place goals. For these reasons, this Court concludes that the Sherman Act does not apply to the actions of NOW in furtherance of its convention boycott campaign." *Id.* at 305 (footnote omitted).

## II. Scope of the Sherman Act

### A. *Legislative History*

This court would be remiss if it did not acknowledge at the outset that the specific question this case presents has not been decided by the Supreme Court or, for that matter, by any other appellate court.[4] There is certainly language used by the Court in some of its cases that provides guidance, however, and the applicability of *Noerr* to the situation cannot be denied.

The first question relevant to our inquiry is whether the intent of Congress was that the Sherman Act would cover activities such as NOW has undertaken in this case.[5]

The 50th and 51st Congresses were primarily concerned with business trusts and the economic power which those trusts possessed.[6] The trust concept involved the

---

**4.** *But see Council of Defense v. International Magazine Co.*, 267 F. 390 (8th Cir. 1920), wherein a state-created Council of Defense sought to boycott a publishing company because of the pro-German sympathies of stockholder William Randolph Hearst. In *Council of Defense*, this court found that the Council's actions did violate the Sherman Act. However, it is significant to note that our court held in that case that "[t]he declared and obvious purpose was to destroy complainant's business in New Mexico." *Id.* at 411.

In the immediate case, no such purpose exists—in fact, there was a specific finding by the district court that there was no punitive purpose in NOW's boycott in the sense that it was designed to punish for past conduct. The economic coercion of the boycott was designed to procure affirmative action by the Missouri legislature. In *Council of Defense* there was economic punishment for past actions; in the instant case there is economic injury to achieve immediate or future action.

Further, a more basic distinction is that *Council of Defense* did not involve any issue of the right to petition, a fundamental consideration in the instant case and in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). There can be drawn a distinction between political speech and petitioning of the government. At some point, a line must be drawn; this is not the case in which it is necessary to draw the line.

*State v. Horsemen's Benevolent & Protective Ass'n*, 55 A.D.2d 251, 389 N.Y.S.2d 868 (1976) does consider a very similar issue, although the Sherman Act was not involved. In that case, an association of horse owners engaged in a boycott of horse racing (in order to pressure the state to finance an employee pension plan, the cost of which would otherwise fall on the association's members), causing a cessation of racing at Aqueduct. The state brought an action against the association under the New York State "Little Sherman Antitrust Act" for damages. The court disposed of the issue we find so troublesome in this case with the statement "[t]his was not merely an attempt to influence legislation, see *Eastern R. Conf. v. Noerr Motor Freight*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 [1961] * * *." *State v. Horsemen's Benevolent & Protective Ass'n*, *supra*, 389 N.Y.S.2d at 869. We do not find the court's reasoning persuasive.

*See also Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288 (8th Cir. 1978).

**5.** Examples of political boycotts include the boycott of Florida citrus products which was to protest against the Miami referendum withdrawing protection for gay civil rights, and the refusal by colonists to import British goods in order to communicate the strength of public feeling against the Stamp and Townsend Acts early in our country's history.

One of the more famous political boycotts occurred in Montgomery, Alabama, to protest the racial segregation and discrimination on city buses. There have been consumer boycotts on meat, supermarkets, grapes, iced tea in cans, sugar or soft drinks, slacks, lettuce, textiles, chocolate, Saran Wrap, Mexico, tuna, animal skins and furs, Russian products and Japanese products.

The term boycott was derived from a method of retaliation used against a land agent, Captain Boycott, who paid starvation wages to tenants and then evicted those who protested these wages. Tenants rallied the support of Boycott's servants, herders and drivers, and all agreed to cease relations with the Boycott family. *See* Webster's Third New International Dictionary 264 (1971).

**6.** The legislative history of the Sherman Act is comprehensively compiled and edited in 1 E. Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes (1978). *See also* Letwin, *Congress and the Sherman Antitrust Law: 1887–1890*, 23 U.Chi.L.Rev. 221

shareholders transferring their shares to a single trustee or board of trustees who would exercise complete control over the management of the trust; the shareholders received trust certificates which entitled them to a share of the profits of the trust. Since the trust did not require state sanction, as did corporations, and since the trusts were not subject to the controls and restrictions that states could impose on corporations, they were more unwieldy than corporations. 1 E. Kintner, The Legislative History of the Federal Antitrust Laws and Related Statutes 10 (1978). *See generally id.* at 8–13. Public hostility towards the trusts in the late 1800's was immense and severe. *Id.* at 11; Letwin, *Congress and the Sherman Antitrust Law: 1887–1890,* 23 U.Chi.L.Rev. 221, 235 (1956).

> Because a trust typically controlled the integrated levels of a particular industry, it could often control the means or sources of supply and dictate the prices or terms at which commodities would be bought, sold, or transported. Moreover, large concerns often agreed to divide markets and to fix prices, engaged in predatory pricing, and discriminated in favor of certain entities.

1 E. Kintner, *supra* at 11. The kind of remedy that the public desired was a law to destroy the power of the trusts, Letwin, *supra* at 235, and such was the purpose of the Sherman Act. But to limit the purpose to such a general one is misleading.

Clearly, by prohibiting trusts, the Congress sought to achieve the preservation of free and fair competition. *See, e. g.,* 1 Kintner, *supra* at 113–18, *quoting* 21 Cong. Rec. 2456–58 (1890) (remarks of S. Sherman). Unfortunately, an examination of the legislative history does not clearly indicate the answer to the question we have

here—whether Congress wanted to protect "free and fair" competition from political or social activities that can have the same effect upon competition as the commercial activities of a trust against a business. *See, i. e.,* Bird, *Sherman Act Limitations on Noncommercial Concerted Refusals to Deal,* 1970 Duke L.J. 247 (1970); Kestenbaum, *The Antitrust Challenge to the Arab Boycott: Per Se Theory, Middle East Politics and United States v. Bechtel Corp.,* 54 Tex. L.Rev. 1411 (1976); Comment, 30 U.Chi.L. Rev. 171 (1962).[7] Missouri does not direct us to, nor have we discovered, any legislative history that indicates an affirmative intent of Congress to do so. The few comments that we find that have some relevance to the question indicate otherwise. For example, the following exchange took place between Senator Sherman, the sponsor of the Act, and Senator George, a major opponent of the Act.[8]

Mr. GEORGE. Mr. President, this is a very important subject. The bill undertakes to deal with very great evils which in the last few years have done great injury to the people of the United States. I am in favor of legislation to prevent trusts and combinations, but I want effective legislation—legislation that will crush out these combinations and trusts. * * *.

I have given some thought and some reflection to this matter, and I am extremely anxious that some bill shall receive the assent of this Congress which will put an end forever to the practice, now becoming too common, of large corporations, and of single persons, too, of large wealth, so arranging that they dictate to the people of this country what they shall pay when they purchase, and what they shall receive when they sell.

---

(1956). Letwin examines the political mood of the country during the years that Congress discussed and passed the Sherman Act.

**7.** The argument that the Sherman Act should cover, *i. e.,* all boycotts regardless of motivation, purpose, ultimate goal, etc., is that without coverage, groups would be able to pool economic power in pursuit of private goals with "no more than self-imposed restraints on harms caused to others. The danger is in the

collective possession of power itself * * *." Bird, *Sherman Act Limitations on Noncommercial Concerted Refusals to Deal,* 1970 Duke L.J. 247, 260 (1970).

**8.** Kintner points out in his book that Senator James Z. George (D., Miss.), played a significant role in shaping the Sherman Act. 1 E. Kintner, *supra* at 15.

I have considered with some care the provisions of this bill. I do not believe that the effect of its provisions is accurately understood by members of this body. I propose, therefore, to make an analysis of its provisions to see, if we can, what it means, what evils it undertakes to remedy, and what remedy it provides, and how efficacious this remedy may prove to be.

In the beginning, I desire to call the attention of the Senate to the fact that the provisions of this bill are not confined to trusts, to combinations, to arrangements and agreements made between parties who are engaged in business; or, in other words, taking the language of the bill in its plain meaning, it refers to and brings within the punitory provisions of the fourth section not only arrangements and agreements between manufacturers, between sellers, between transporters, but it brings within its grasp arrangements made by any persons, though merely for moral and for defensive purposes. The bill provides—

That all arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view, or which tend, to prevent full and free competition in the importation, transportation, or sale of articles imported into the United States shall be unlawful.

That would apply to an arrangement, to an agreement, to a combination, not of a business character, but, as I before remarked, to such as is purely moral and defensive. It does not say that all arrangements, contracts, etc., made between persons and corporations engaged in selling, transporting, importing, manufacturing, or producing the articles described in the bill shall be unlawful; but it applies to all persons whether so engaged or not. So if this bill passes as it now stands, the farmers and laborers of this country who are sending up their voices to the Congress of the United States, asking, pleading, imploring us to take action to put down trusts, these farmers and these laborers will find that they themselves in their most innocent and necessary arrangements, made solely for defensive purposes against the operations of these trusts, will be brought within the punitory provisions of this bill.

It will strike the Senate probably with some astonishment if it be ascertained that under this bill the arrangements made by the Southern farmers during the last season to prevent the consummation of the robbery of them by the jute-bagging trust are made highly criminal. Under it the farmers of the South who combine to prevent and defeat that most iniquitous and unjust combination will find that they themselves rather than the jute-bagging trust will be the subjects of severe punishment.

\*　　\*　　\*　　\*　　\*.　　\*

Upon the formation of this bagging trust the cotton farmers of the South, many of them in their granges and in their alliances, agreed that they would not purchase jute bagging, and by that agreement to a very large extent the rich rewards anticipated by the men who formed the trust were defeated. These combinations tended to prevent full and free competition in the sale of this article. But if that is not very clear, if Senators think these arrangements of the farmers did not have the effect of preventing this full and free competition, I call their attention to another provision contained in the third section of the bill, which reads in this way:

If acts shall be done under any such arrangement, contract, agreement, trust, or combination, which have for their purpose, or which shall tend to compel the giving up or sale of any lawful business, the person, partnership, or corporation injured thereby may sue for and recover in any court of the United States of competent jurisdiction the damages sustained thereby.

The very object of this combination of Southern farmers was to break down the trust in jute bagging, to compel the men who had seized and got control of the bagging manufacture of this country to give up their business—to loose their grip upon the business of the farmers. It also very clearly violated the other provision of the bill to which I have just called attention. The

fact that the bill does not restrict these combinations, these agreements, to persons engaged in trade, engaged in transportation, engaged in importation, engaged in selling—the fact that it applies to all arrangements, all agreements, all combinations, by whomsoever made, would bring within its reach all defensive agreements made by farmers for the purpose of enhancing the price of their products. This bill, instead of preventing trusts, would have the effect of crushing out all efforts of the people to rid themselves of their injurious effects. . . .

Mr. SHERMAN. Do I understand my friend from Mississippi to claim that under this bill an agreement made by farmers not to buy cotton-bagging or not to buy anything else is a combination within the meaning of the act?

Mr. GEORGE. Yes, sir; directly within the meaning of the act.

Mr. SHERMAN. That is a very extraordinary proposition. There is nothing in the bill to prevent a refusal by anybody to buy anything. All that it says is that the people producing or selling a particular article shall not make combinations to advance the price of the necessaries of life. However, I simply wished to get the answer of the Senator.

Mr. GEORGE. That is the true construction of this bill which I put on it.

Mr. SHERMAN. I desire to say distinctly that that is not my idea or the idea of any one of the committee.

Mr. GEORGE. I presume it is not.

Mr. SHERMAN. Nor do I believe it is a fair construction of the bill.

Mr. GEORGE. But yet that is the legal meaning and force of the bill; and I will state to the Senate and to the Senator from Ohio that it is directly within the terms of this bill to forbid any number of persons belonging to or joining a temperance society whose object is to compel retailers of intoxicating liquors to give up their business.

Mr. SHERMAN. Where men agree that they will not drink at all, does the Senator think that is a combination in restraint of the trade of liquor-sellers?

Mr. GEORGE. What is it?

Mr. SHERMAN. The Senator, as I understand, now claims that an agreement among several people not to drink whisky or brandy is in restraint of the trade of selling whisky or brandy and is therefore a combination within the meaning of this bill?

Mr. GEORGE. I insist that a society, making an agreement or a combination between citizens of a town anywhere in the Union not to drink, not to use in any way vinous or spirituous liquors, and to persuade others to a similar abstention, does, in the language of this bill, tend to compel persons engaged in retailing liquor in that community to give up their business, and the doing of that is expressly condemned by the third section of this bill. . . . . .

Mr. [WILLIAM M.] STEWART [R., Nev.]. If an organization for the purpose of having laws passed creating high license is formed, would not that enhance the value of the things prohibited in this bill?

Mr. GEORGE. I have considered that question. I have thought possibly that the courts might say that the right of political organization to bring about political results by legislation was not embraced within the provisions of the bill.

1 Kintner, *supra* at 77–79, *quoting* 20 Cong. Rec. 1458–59 (remarks of S. Sherman, S. George and S. Stewart) (1889).

Another conversation that has as its subject the scope of the bill is as follows:

Mr. WILSON, of Iowa. I desire to offer an amendment to come in at the end of section 1 of the bill, and as an addition to the proviso contained in that section.

The PRESIDING OFFICER. The Secretary will state the amendment proposed by the Senator from Iowa.

The CHIEF CLERK. It is proposed to add at the end of the second proviso to section 1:

Nor to any arrangements, agreements, associations, or combinations among persons for the enforcement and execution

of the laws of any State enacted in pursuance of its police powers; nor shall this act be held to control or abridge such powers of the States.

The PRESIDING OFFICER. The question is on agreeing to the amendment proposed by the Senator from Iowa. . . .

Mr. EUSTIS. Where does the Senator propose his amendment to come in?

Mr. WILSON, of Iowa. I propose it as an addition to the proviso of section 1, and it is simply for the purpose of avoiding an effect which is likely to flow from the earlier provisions of that section. That section provides as follows:

> That all arrangements, contracts, agreements, trusts, or combinations between two or more persons or corporations, or both, made with a view or which tend to prevent full and free competition in the importation, transportation, or sale of articles imported into the United States, or with a view or which tend to prevent full and free competition in articles of growth, production, or manufacture of any State or Territory of the United States with similar articles of the growth, production, or manufacture of any other State or Territory, or in the transportation or sale of like articles, the production of any State or Territory of the United States, into or within any other State or Territory of the United States: and all arrangements, trusts, or combinations between such persons or corporations made with a view or which tend to advance the cost to the consumer of any such articles are hereby declared to be against public policy, unlawful, and void.

I will state frankly my purpose in offering the amendment. Under the provisions of this section, should it become a law, every organization in such a State as Iowa, for instance, of the character of the Woman's Christian Temperance Union, the Temperance Alliance, and other organizations intended to promote the execution of the laws of that State in respect of the manufacture and sale of intoxicating liquors would become illegal bodies and their move-

ments subject to the terms and provisions of this bill. I know that was not intended, and yet the language, without being stripped of its power by the amendment I propose, would include all organizations of that kind. All I ask is that the subjects within the police power of the States as embraced within that legislation, of Iowa and any other State which may desire similar legislation, shall not be embraced within this provision, but that the States shall be left free in the execution of their police powers. . . .

I will just add to what I have said that the proviso to which I offered this as an amendment excepts from the operations of this section of the bill arrangements, agreements, or combinations between laborers, made with a view of lessening the number of hours of their labor or of increasing their wages, and it also excepts arrangements, agreements, associations, or combinations among persons engaged in horticulture or agriculture, made with a view of enhancing the price of their own agricultural or horticultural products. I think that the exception which I ask to have made by this amendment is quite as worthy of the support of the Senate as either of these.

Mr. HOAR. Allow me to ask the Senator if his amendment accomplishes his object. I understand his object is to protect combinations of persons intended to discourage the use and manufacture of intoxicating liquors.

Mr. WILSON, of Iowa. My object is to exclude them from the operation of the bill.

Mr. HOAR. I understand, to protect them from being affected by it. But the only description in his amendment is of such associations as are in aid of the execution of the laws of a State in pursuance of its police power. Now, if this bill without his amendment would render the class of persons he has described subject to the penal provision, all temperance societies whose object is to persuade mankind not to use intoxicating liquors would still remain in spite of his amendment within the purview of the bill. It seems to me he should extend

his amendment a little further, because, as far as my State goes, this class of associations which he has described do not confine their efforts to the execution of the law, but their efforts are a great deal more extensive and extend to discouraging the use or manufacture of intoxicating liquors altogether. This is what he means, and we would all vote for it.

Mr. WILSON, of Iowa. I am satisfied that my amendment will cover the purpose I have in view concerning my State. If other Senators desire something further in regard to their States, they can move it.

Mr. HOAR. I move to amend the Senator's amendment by adding to it:

Or to discourage the use or manufacture of intoxicating liquors.

And we will take a vote on that. . .

The PRESIDING OFFICER. The question is on agreeing to the amendment to the amendment.

Mr. SHERMAN. The Senator from Iowa showed me his amendment. As these organizations in Iowa are associated and organized something in the nature of a corporation, there might be some reason for believing that they possibly might fall within the meaning of the clauses of the bill. Therefore, I have no objection to his amendment, but I do not see any reason for putting in temperance societies any more than churches or school-houses or any other kind of moral or educational associations that may be organized. Such an association is not in any sense a combination or arrangement made to interfere with interstate commerce; but under the peculiar circumstances, upon the facts stated by the Senator from Iowa, I think it is very proper to make an exception of those organizations in Iowa which are really in aid of the execution of State law. I would apply it to all organizations which are using either moral or any other kind of means for the enforce-

ment of local laws; but I do not think it is worth while to adopt the amendment of the Senator from Massachusetts, because that would include temperance societies. You might as well include churches and Sunday schools.

*Id.* at 250–52, *quoting* 21 Cong.Rec. 2658–59 (1890).

As the exchanges reveal, the conversation provides an *indication*—we do not set it out to show an affirmative statement of intent. Yet, the indication is that it was the competitors in commerce that Senator Sherman had in mind as the concern of his bill, not noncompetitors motivated socially or politically in connection with legislation.

We conclude that the legislative history of the Sherman Act does not reveal that Congress intended to prohibit, with the Sherman Act, activities such as NOW's boycott; this is not inconsistent with the Supreme Court cases considering similar questions.

### B.  *Case Law*

As the district court in this case stated from the bench, "this is a unique case. It is different from any case in the law books anywhere. There simply has never been another one like it." Consequently, and as we noted earlier, the question of whether NOW's specific sort of activities—an economic boycott, politically motivated, to achieve a legislative goal—was intended by Congress to be within the scope of the Sherman Act, has not been specifically addressed by the Supreme Court. We can, however, find guidance in several of the Court's opinions by noting a complete lack of an affirmative indication that such activities are covered, by taking cognizance of the Court's passing references that indicate that the activities that were meant to be covered are competitive activities by competitors with some self-enhancement motivation,[9] and by a thorough analysis of *East-*

---

9. For example, note the Supreme Court's language in *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). In reference to a discussion of whether or not the challenged practice (a

boycott) was reasonable, necessary and beneficial, the Court stated:

As we have pointed out, however, the aim of petitioners' combination was the *intentional destruction of one type of manufacture and*

ern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

One of the early, but still timely, Supreme Court discussions of the legislative history of the Sherman Act is found in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) wherein the Court ruled that the scope of the Sherman Act did not extend to state action.

In the course of its discussion, the Court draws conclusions "not from the literal meaning of the words" of the Act, but from "the purpose, the subject matter, the context and the legislative history of the statute." *Id.* at 351, 63 S.Ct. at 313. As the Court noted in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 687, 98 S.Ct. 1355, 1362, 55 L.Ed.2d 637 (1978), the Sherman Act cannot mean what it says. It was the legislative history upon which the *Parker* Court relied—the fact that "[t]here is no suggestion of a purpose to restrain state action in the Act's legislative history"—in making its determination that the California raisin pro-rate program was not within the scope of the Sherman Act. *Parker v. Brown, supra,* 317 U.S. at 351, 63 S.Ct. at 313. Of particular importance to the Court's discussion was the fact that an unexpressed congressional purpose to nullify or restrain a state's control over its officers and agents should not be lightly attributed to Congress via the Sherman Act.

In the instant case, an infringement upon the people's right to petition the government by a boycott should also not be lightly attributed to Congress. We perceive a

more accurate phrasing of Congress' concern to be not the elimination of boycotts, but elimination of boycotts used by a competitor against a competitor (or against a supplier, customer, etc.) in the business of competing. For example, in the legislative history to which the Court makes reference in *Parker v. Brown, supra,* 317 U.S. at 351, 63 S.Ct. at 313, 21 Cong.Rec. 2562 (1890), Senator Sherman states that the Act is meant to apply to "business combinations," not to "voluntary associations."

In *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), one of the primary boycott cases considered by the Supreme Court, the Court held that the Sherman Act was meant to cover what the district court had found to be a "purely private quarrel." In the course of its explanation, the Court discusses the boycott in terms of a business activity amongst competitors. *Id.* at 210–13, 79 S.Ct. at 708–710. The Court also criticizes the court of appeals for its heavy reliance on *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) and in considering the lack of significant effect on the market as relevant in not finding a violation. While noting that there is some strong language in *Apex* that indicates section one Sherman Act violations must include an effect on market prices, the Court emphasizes that the defendant in *Apex* was a labor union and that part of the basis for the *Apex* decision was a recognition that the Sherman Act "is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which

---

sale which competed with Guild members. The purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice *upon a rival method of competition*, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts. *Id.* at 467–68, 61 S.Ct. at 708 (emphasis added). The Court's language indicates that the Court conducted its analysis assuming that the category of acts which the Sherman Act condemned were those within the competitive business economy of the United States.

We do not mean to overemphasize any reliance upon this type of implicit reference to

competitors' practices made by the Court; indeed, we fully recognize that there are probably just as many statements that do not contain such qualifying language. For example, there are comprehensive statements such as follows:

Section 1 of that Act makes illegal *every* contract, combination or conspiracy in restraint of trade or commerce among the several states; § 2 makes illegal *every* combination or conspiracy which monopolizes or attempts to monopolize any part of that trade or commerce.

*Id.* at 465, 61 S.Ct. at 707 (emphasis added).

normally have other objectives." *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 213 n.7, 79 S.Ct. at 710. While the statement was not necessary to the outcome of the case, the Court's decision in *Klor's* includes a signal that the focus of the Sherman Act is upon commercial-business activities, and that the organization and objectives involved can make a difference in the application of the Act.

Thus, at a minimum, in *Parker,* the Court tells us that the Sherman Act does not mean exactly what it says, i. e., "all combinations in restraint of trade," and that the Act must be interpreted with the setting in which it was enacted; in *Klor's,* even when considering the impact of a boycott, the Court does not use overly broad language in holding that the Sherman Act covers such activity. Instead, the Court focuses upon the business nature of the boycott, the intent of the Act to cover "business combinations with commercial objectives," and concludes that the boycott is within the scope of the Act.[10]

Other cases considered by the Supreme Court help define the scope of the Sherman Act, and in a passive manner, limit the Act to apply to commercial activities, as opposed to social or political activities. *See, e. g., Apex Hosiery Co. v. Leader, supra* (narrowing the scope of the Act in regard to union activities) and *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 553, 64 S.Ct. 1162, 1174, 88 L.Ed. 1440 (1944) (the Act does apply to insurance companies —"every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states.")

The first Supreme Court case, however, that actively deals with the type of conflict we have in the present case, is *Eastern Railroad Presidents Conference v. Noerr*

*Motor Freight, Inc., supra.* Although the factual situation in *Noerr* differs from that of this case,—sufficiently that we must specifically address those distinctions—the overriding policy implications of *Noerr* are persuasive.

In *Noerr,* the defendant railroads had engaged in a publicity campaign with the purpose of fostering the adoption and retention of laws that would be destructive of the trucking business.

Basically, the Supreme Court held that the railroads' campaign to get the legislature to pass laws, no matter how unethical that campaign was, was not within the scope of the Sherman Act. The Court said, *inter alia,* "no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Id.* 365 U.S. at 135, 81 S.Ct. at 528. Even this strict ruling sheds some light on the instant case inasmuch as NOW's boycott was stipulated to be an attempt to influence ratification by the Missouri legislature of the proposed ERA. *State of Missouri v. National Organization for Women, Inc., supra,* 467 F.Supp. at 293.

It also demands that we deal with the first factual distinction between *Noerr* and our case, and that is the subject matter of the legislation. The legislation in *Noerr* directly concerned the alleged violators of the Sherman Act and the target of the alleged violation, the railroads and the truckers. The parties were intimately affected by and concerned with the legislation as the legislation would either directly hurt or help them "financially," "economically," and "commercially."

The ERA is not a "financial," "economic," or "commercial" piece of legislation. It is a social or political piece of legislation. While

---

**10.** The Court states that boycotts have long been forbidden and cites *Kiefer-Stewart Co. v. Seagram & Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951)—"such agreements * * * cripple the freedom of traders"—in emphasizing the disfavor with which the courts have viewed boycotts. Additionally, *Klor's* has been interpreted as standing for the proposition that boycotts are illegal per se. Handler, *Recent Developments in Anti-*

*trust Law: 1958–1959,* 59 Colum.L.Rev. 840, 862 (1959). However, even in the portion of its opinion in *Klor's* where the Court addresses the crippling effects of boycotts, the Court focuses upon "[g]roup boycotts, or concerted *refusals by traders to deal with other traders* * * *.*" *Klor's, Inc. v. Broadway-Hale Stores, Inc., supra,* 359 U.S. at 212, 79 S.Ct. at 709 (emphasis added).

it is obviously perceived by the members of NOW as beneficial, the record indicates, and it seems apparent, that the orientation of both parties, NOW and Missouri, to the ERA is not one of profit motivation. The only financial, economic or commercial matter involved here is Missouri's concern about the financial repercussion of the boycott.

[1] Keeping in mind that what we are discussing is the applicability of the Sherman Act to the facts, and the intent of the Congress to cover such situations, the difference in the content of the legislation—if anything—makes it more clear that NOW's efforts to influence the legislature's action on the ERA are beyond the scope and intent of the Sherman Act. A social piece of legislation and the efforts involved in influencing the legislature's actions on such legislation is further afield from the central focus of the Sherman Act than a commercial piece of legislation [11] and the petitioning efforts associated therewith.

Thus, considered in isolation, the subject matter of the ERA is not helpful to Missouri's arguments. Missouri, however, argues the relevancy of the distinction in connection with its "secondary boycott" theory.

Missouri refers to NOW's activities as a secondary boycott and argues that the district court, in not specifically finding that there was a secondary boycott, erred in its factual findings. Missouri argues that the error taints the district court's other findings and its analysis of the legal issues. The only clue as to exactly how this taint distorts the district court's findings is Missouri's claim that it affected the court's statement that if this "were not a *legitimate* effort to influence the legislature, this Court would be presented with a different case." *Missouri v. National Organization for Women, Inc., supra,* 467 F.Supp. at 306

(emphasis added by Missouri in its brief). Missouri appears to equate legitimate efforts to influence a legislature with ethical or non-harmful efforts to influence the legislature.

The Supreme Court establishes the fallacy of this equation in *Noerr.* In its discussion of the railroad's publicity campaign used to influence the legislature which, besides being unethical and harmful, was characterized as deceptive and vicious, the Court noted that the campaign was intended to and did injure the truckers in their relationship with their customers. But

> [i]nsofar as that Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity. The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena. Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation. All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical.

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. at 140–41, 81 S.Ct. at 531 (footnote omitted). The boycott in this case had a commercial impact and has been called unethical. But—it is political activity aimed at persuading the legislature to take action.[12]

---

11. *Parker v. Brown, supra,* of course, deals with the content of legislation by its state action exemption.

12. Further, the factual setting which Missouri depicts as the background to its "secondary boycott theory" ignores the posture of the case. Missouri paints the picture thus: NOW is withholding all convention business from the Holiday-Johnson Motel (HJM) until HJM goes to its legislator and convinces its legislator to vote for the ratification of the proposed ERA. This characterization of the facts portrays HJM as the target of NOW's boycott. The target of the

Missouri also claims that the existence of the boycott takes this case out of the scope of *Noerr*, in that the boycott does not fit within *Noerr*'s controlling principle—that Sherman Act violations cannot be predicated upon "mere attempts" to influence the passage of laws. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra*, 365 U.S. at 135, 81 S.Ct. at 528. The boycott, Missouri argues, makes NOW's activities more than a "mere attempt." [13]

Assuming this to be accurate, one need not go further than the *Noerr* case to determine what controls when there is more than a mere attempt. The *Noerr* Court initially discusses the three considerations which lead to the Court's conclusion that activities which are comprised of mere solicitation of governmental action with respect to the passage of laws are not violative of the Sherman Act. Those are (1) the essential dissimilarity between an agreement to jointly seek legislation and the agreements traditionally condemned by the Sherman Act; (2) that such a holding would have the effect of recognizing that the government has the power to act in a representative capacity in refusing the people the right to freely inform the government of their wishes; and (3) generally, but "of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions." *Id.* at 137–38, 81 S.Ct. at 529–30.

But the Court then went on to consider, as a separate issue, whether the publicity

campaign and the techniques used, including the much-discussed "third-party technique," would take the railroad's actions out of the controlling principle discussed in regard to the mere solicitation of the legislature.

Enlightening as to what this so-called third-party technique is the *Noerr* district court's discussion of it:

One of the objectives was the enactment of legislation, *not under the sponsorship of the railroads but by others acting on their behalf,* by what was called in inoffensive and pleasing language, "The third-party technique."

\* \* \* It was also determined that the campaign should be handled through an independent public relations firm. A number of public relations firms were interviewed and of the four or five selected for interview, all were leaders in that particular field. It may be noted in passing that of those interviewed and who submitted proposals, about which proposals testimony was given at the trial, each and every one of the suggested programs provided for a campaign of publicity to put the truckers in a bad light with the public; to encourage normal public resentment of the motoring public to the operation of big trucks on the highways; to secure the assistance of organizations which were apparently "independent and public spirited" in the campaign against the truckers, and *to create a demand for legislation penalizing the truckers either*

---

boycott was not HJM; it was the State of Missouri. It was the State of Missouri which suffered financial loss and which had standing to sue, not "to prosecute purely personal claims of its citizens, \* \* \* but \* \* \* to protect the public interest." *Missouri v. NOW, supra*, 467 F.Supp. at 301, *quoting Kelley v. Carr*, 442 F.Supp. 346, 357 (W.D.Mich. 1977). Further, the facts clearly reveal, and the district court so found, that there were no punitive intentions involved in the boycott insofar as punishment for Missouri's past failure to ratify the ERA was concerned.

We find Missouri's focus on the facts of this case—and not the the district court's—misleading. The district court's view is more appropriate for the issues at hand. NOW's boycott was directed against states that had yet to ratify the proposed ERA. NOW was aware that such a

boycott would work against the public's economic interests; NOW was hopeful that the public's interest would suffer to the extent that the public would be persuaded that ratification of the ERA was "desirable; " NOW wanted the public to influence the legislature to ratify the ERA; NOW operated on the presumption that legislators act with regard for the public interest. This is not distinguishable analytically from *Noerr*.

**13.** In essence, Missouri tries to limit *Noerr* to a case where a combination uses publicity to get a law passed that would harm the truckers. *Noerr* is more than a *Parker v. Brown, supra*, state action exemption case. The Court in *Noerr* discusses the publicity campaign apart from the substantive effect of the legislation.

*by limitation of size and weight or the imposition of user taxes which would make their operation unprofitable.*

*Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference,* 155 F.Supp. 768, 778 (E.D.Pa.1957) (emphasis added).

The organization selected by the railroad to handle the campaign was the Byoir Firm:

The understanding of the Byoir organization as to its duties in connection with the campaign [was] entitled "The Objectives".

*While the ultimate objective is shrewdly set forth as legislation affecting the truckers, the intermediate goals are also set forth, all designed and aimed at injury to the truckers.* These objectives, including the crystallization of motorist resentment arising from commercial heavy truck operations over the roads, were designed to arouse the public generally of the need to obtain new methods of financing public highways and by methods which would not appear to emanate from railroad sources.

*Id.* at 778–79 (emphasis added).

Thus, an additional factor in *Noerr*—that which was more than mere solicitation—was the railroads' third-party technique; further, part of the public relations firm's job was to "create a demand for legislation" by creating public resentment of the trucks. Finally, similar to NOW's goals, the railroad had an ultimate objective—the legislation—and an intermediate goal—injury to the truckers. In the NOW case, the ultimate objective is legislation, and the intermediate goal is inflicting economic injury with the hope of achieving that ultimate objective.

In direct response to the use of the third-party technique, the *Noerr* Court emphasized that the Sherman Act condemns trade restraints and not political activity. The Supreme Court discussed the "publicity campaign" (pseudonym for the third-party technique and the intermediate goal of inflicting injury) as falling clearly within the category of political activity.[14]

The "additional factors" that took the railroad in *Noerr* beyond mere solicitation did not include a boycott. And the Court in *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* *supra,* very pointedly made clear that boycotts are destructive, very possibly more destructive than the third-party technique. Yet, at the bottom line, the *Noerr* "additional factors" and the additional factors in this case cannot be analytically distinguished insofar as it is relevant to the applicability of the Sherman Act.

Admittedly, the *Noerr* Court noted that there were no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers. Here, NOW did attempt and did succeed in persuading others who were "customers" of the State of Missouri not to deal with Missouri. However, the crux of the issue is that NOW was politically motivated to use a boycott to influence ratification of the ERA. In our case, as in *Noerr,* the publicity campaign was not a mere sham to cover up an attempt to interfere with the business relationship of a competitor. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. at 144, 81 S.Ct. at 533.

Further, notwithstanding the superficial impact of the *Noerr* Court's statement that the railroads never directly tried to stop customers from dealing with truckers, and the inherent conflict that the boycott in this case creates with that statement, the distinction is that the NOW boycott is a tool, not just a competitive purpose, just as the "publicity campaign/third-party technique" in *Noerr* was a tool. The results of the tools are the same. The facts demonstrate the similarity. In *Noerr,*

[c]irculars, speeches, newspaper articles, editorials, magazine articles, memoranda and all other documents discuss in one way or another the railroads' charges that heavy trucks injure the roads, violate the laws and create traffic hazards, and urge that truckers should be forced

---

**14.** *See* text accompanying note 12, *supra.*

to pay a fair share of the costs of rebuilding the roads, that they should be compelled to obey the laws, and that limits should be placed upon the weight of the loads they are permitted to carry.

*Id.* at 142–43, 81 S.Ct. at 532.

Here, NOW's concerted activities and publicity campaign were initiated to show that in not ratifying the ERA, Missouri was denying rights to women, and in order to show displeasure with Missouri and to show support for the ERA, organizations were urged by NOW not to hold their conventions in Missouri. The ultimate goal was to have the ERA ratified and the hope was that by boycotting the state for as long as the ERA remained unratified in that state, it would result in a favorable legislative vote. *State of Missouri v. National Organization for Women, Inc., supra,* 467 F.Supp. at 292.

It is true that there were active solicitations by NOW followed by a boycott decision by the recipients of the solicitation. *Id.* at 295. And yet, borrowing from the Supreme Court's language in *Noerr,* the finding by the district court in the instant case that NOW's campaign was intended to and did in fact injure Missouri in its relationship with its convention customers can mean no more than that Missouri sustained a *direct injury* as an incidental effect of NOW's campaign to influence governmental action.

It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity,[15] that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. * * * To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns.

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra,* 365 U.S. at 143–44, 81 S.Ct. at 533. NOW appears to have utilized its political power to bring about the ratification of the ERA by the State of Missouri. The tool it chose was a boycott, a device economic by nature. However, using a boycott in a non-competitive political arena for the purpose of influencing legislation is not proscribed by the Sherman Act.[16]

Thus, while we do not pretend that *Noerr* disposes of all the questions in this case, we additionally do not feel that the distinctions discussed above, notably, the use of a boy-

15. It is important to remember that the district court specifically found that the motivation of NOW was to be viewed from two points, both aimed at the legislative process. These two points were (1) the desire of NOW to make a symbolic gesture and (2) the desire of NOW to create publicity, i. e., attract attention and bring public visibility to the issue of ratification. *State of Missouri v. National Organization for Women, Inc., supra,* 467 F.Supp. at 295.

16. The State of Missouri cites *Hennessey v. NCAA,* 564 F.2d 1136, 1147–49 (5th Cir. 1977); *Young v. Motion Picture Ass'n of America, Inc.,* 112 U.S.App.D.C. 35, 299 F.2d 119 (D.C. Cir.), *cert. denied,* 370 U.S. 922, 82 S.Ct. 1565, 8 L.Ed.2d 504 (1962); *AMA v. United States,* 76 U.S.App.D.C. 70, 130 F.2d 233 (D.C.Cir.1942), *aff'd,* 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943); *Tondas v. Amateur Hockey Ass'n,* 438 F.Supp. 310 (W.D.N.Y.1977); *Tropic Film Corp. v. Paramount Pictures Corp.,* 319 F.Supp. 1247 (S.D.N.Y.1970); and *American Brands, Inc. v. National Ass'n of Broadcasters,* 308 F.Supp. 1166 (D.C.Cir.1969) for the proposition that the Sherman Act applies to noncommer-

cial and non-economic boycotts. We do not decide that issue. The Sherman Act may apply in some situations to noncommercial and non-economic boycotts. However, we do not rest our decision in this case upon the basis that the boycott was noncommercial and non-economic. Our decision is based upon the right to use political activities to petition the government, as was the underlying factor in *Noerr.* None of the cases cited above involved the political right to petition the government, thus it is not necessary in this case to distinguish them.

The same is true of *Council of Defense v. International Magazine Co.,* 267 F. 390 (8th Cir. 1920). *See* note 4 *infra.*

Other courts have been more generous and have equated noncommercial activities with a political right to petition the government. *See, i. e., Council for Employment & Economic Energy Use v. WHDH Corp.,* 580 F.2d 9 (1st Cir.), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 634 (1978). It is not necessary, under the facts of our case, for our ruling to be so broad.

cott and the injury of a noncompetitor (Missouri) by a noncompetitor (NOW), are relevant to the applicability of the Sherman Act.

There resulted a restraint of trade in the *Noerr* case just as has occurred in this case. In *Noerr* it was accomplished by means of a publicity campaign with the ultimate goal of obtaining legislation that commercially or competitively affected the competitor-campaigners and competitor-target. In the instant case, it was accomplished by means of a publicity-boycott campaign with the ultimate goal of obtaining socially or politically-oriented legislation that had no effect upon the campaigners or target, at least in a commercial or business sense. These distinctions are not where our focus should be.

Rather, the focus should be on the overriding consideration in *Noerr*, the legislative intent concerning the scope of the Sherman Act. And *Noerr* deals with this in a strong fashion:

Inherent in such fights [as occurred in the *Noerr* case], which are commonplace in the halls of legislative bodies, is the possibility, and in many instances even the probability, that one group or the other will get hurt by the arguments that are made. In this particular instance, each group appears to have utilized all the political powers it could muster in an attempt to bring about the passage of laws that would help it or injure the other. But the contest itself appears to have been conducted along lines normally accepted in our political system * * *.

*Id.* at 144–45, 81 S.Ct. at 533.

### III. State Claims

Having decided that the Sherman Act does not make NOW's activities the basis of a cause of action for the State of Missouri, we turn to the other two theories under which Missouri claims NOW's activities create a lawsuit.

The first of these, the Missouri antitrust law, Mo.Stat.Ann. § 416.031.1 (Vernon 1979): "Every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful," can be disposed of

with the same rationale with which we have disposed of the Sherman Act claim. Mo. Stat.Ann. § 416.141 (Vernon 1979) provides: "Sections 416.011 to 416.161 shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes." Thus we hold that, just as there is no cause of action under section one of the Sherman Act, there is no cause of action under Mo.Stat.Ann. § 416.031.1 (Vernon 1979).

The final theory under which Missouri brings its lawsuit against NOW is a state common law tort claim of intentional infliction of harm without legal excuse.

The Restatement Second of Torts § 766B (1977) provides:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

The factors to be considered in determining whether the interference is improper are listed in the Restatement Second of Torts § 767 (1977):

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

We find, as the district court found, that the discussion and analysis of the court in *Sierra Club v. Butz*, 349 F.Supp. 934 (N.D. Cal.1972) is applicable to the instant case.

The facts are distinguishable; *Sierra Club* involved (1) asserting administrative appeals, (2) filing a complaint in federal court seeking injunctive and declaratory relief, and (3) making other complaints and arguments to the United States Forest Service urging action by the governmental agency. Additionally, there was no boycott involved in *Sierra Club*. But, for the same reasons given in our discussion of the distinctions between *Noerr* and the immediate case, we find these distinctions irrelevant. Further, *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) establishes the *Noerr* doctrine applicability to petitioning of courts and administrative agencies.

In *Sierra Club*, plaintiff had moved that the defendant's counterclaims be dismissed for failure to state a claim upon which relief could be granted, Fed.R.Civ.P. 12(b). The counterclaims contained two counts, both based on state law tort liability for interference with advantageous relationships. The basis of the defense against the counterclaims was the First Amendment provision guaranteeing the right of the people to petition the government for a redress of grievances. The court concluded that

> liability can be imposed for activities ostensibly consisting of petitioning the government for redress of grievances only if the petitioning is a "sham," and the real purpose is not to obtain governmental action, but to otherwise injure the plaintiff.

*Sierra Club v. Butz, supra*, 349 F.Supp. at 939. In reaching this conclusion, the district court relied upon the *Noerr* Court's

reference to the constitutional issue that would be involved were the Sherman Act interpreted to outlaw attempts to influence legislation.

■ We agree with the *Sierra Club* court and find sufficient support in *Noerr* and the subsequent cases of the Supreme Court which refer to *Noerr* to support the conclusion that the right to petition is of such importance that it is not an improper interference even when exercised by way of a boycott.

Cases citing *Noerr, e. g., First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Broadrick v. Oklahoma*, 413 U.S. 601, 614, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962), do not modify or limit the language of *Noerr* to the extent that the *Noerr* doctrine becomes something else. However, many of the cases do focus on the *Noerr* Court's reliance on the right of petition and the important constitutional questions that would be raised should the Court impute to Congress via the Sherman Act an intent to cover the *Noerr* activities.[17] *Eastern Railroad Presi-*

---

17. An important exception to this statement is *United Mine Workers of America v. Pennington, supra*, 381 U.S. at 669–72, 85 S.Ct. at 1592–94. In "*Pennington*" (as in "*Noerr-Pennington* doctrine") the Court's reference to *Noerr* is rather undramatic and rather unenlightening insofar as what general application the Court plans to give *Noerr* in the future. It is surprising, however, only to the extent that one expects more out of the *Pennington* of

"*Noerr-Pennington*;" the facts of *Pennington*, however, require the Supreme Court only to reiterate that *Noerr* "shields from the Sherman Act a concerted effort to influence public officials *regardless of intent or purpose*." *Id.* at 670, 85 S.Ct. at 1593 (emphasis added).

In *Lafayette v. Louisiana Power & Light Co., supra*, 435 U.S. at 399–400 n.17, 98 S.Ct. at 1130 n.17, the Supreme Court noted the *Pennington* holding and added: "Subsequent cases

dents Conference v. Noerr Motor Freight, Inc., supra, 365 U.S. at 138–39, 81 S.Ct. at 530. But see id. at 132 n.6, 81 S.Ct. at 526 n.6.

Of those cases that emphasize the Noerr Court's reference to the constitutional concerns involved in Noerr, California Motor Transport Co. v. Trucking Unlimited, supra, was the one that dealt with it in the most expanded manner. In Motor Transport, Justice Douglas stated that the Noerr decision rested upon two grounds: (1) that there was no basis in the Sherman Act's legislative history by which to impute a purpose to regulate political activity and (2) that "[t]he right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms." Id. 404 U.S. at 510, 92 S.Ct. at 611, quoting Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra, 365 U.S. at 138, 81 S.Ct. at 530. After stating this, the Court then extended the Noerr philosophy to the use of the channels and procedures of state and federal agencies and courts on the basis that not to do so would be destructive of the rights of association and of petition. Id., 404 U.S. at 510, 92 S.Ct. at 611. More importantly, in the course of invoking the sham exception to the Noerr case, the Court's focus is on the First Amendment rights, id. at 510–516, 92 S.Ct. at 611–614; "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' * * which the legislature has the power to control." Id. at 515, 92 S.Ct. at 614, quoting NAACP v. Button, supra, 371 U.S. at 444, 83 S.Ct. at 343.[18]

The parties do not even argue that there is a sham in this case; indeed, Missouri specifically argues that even those residents of Missouri who support the ERA must

suffer as a result of this boycott. Thus the central point in California Motor and the other cases citing Noerr is the shift in focus from the Noerr holding that the railroads' activities are beyond the intent of Congress, insofar as the Sherman Act is concerned, to the Noerr statement that there are serious constitutional questions involved also.

The Court continued its mention of the constitutional issue presented in Noerr in Lafayette v. Louisiana Power & Light Co., supra, 435 U.S. at 399, 98 S.Ct. at 1129 and in First National Bank v. Bellotti, supra, 435 U.S. at 792 n.31, 98 S.Ct. at 1424 n.31.

In Lafayette, the Court stated that only two policies have been held to be "sufficiently weighty to override the presumption against implied exclusions from coverage of the antitrust laws"—one of which was the Noerr doctrine. (The other was the Parker state action exemption.) Lafayette v. Louisiana Power & Light Co., supra, 435 U.S. at 399, 98 S.Ct. at 1129. "[A] contrary construction [in Noerr] would impede the open communication between the polity and· its lawmakers which is vital to the functioning of a representative democracy. * * * '[A]nd of at least equal significance,' is the threat to the constitutionally protected right of petition which a contrary construction would entail." Id., quoting Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., supra, 365 U.S. at 137–38, 81 S.Ct. at 529–530. See also Continental Ore Co. v. Union Carbide & Carbon Corp., supra, 370 U.S. at 707, 82 S.Ct. at 1414, and NAACP v. Button, supra, 371 U.S. at 430–31, 83 S.Ct. at 336–337, where the Court specifically emphasizes the Noerr Court's reference to the constitutional concerns involved in Noerr.

Thus, we feel that the Supreme Court's treatment of its Noerr doctrine requires

---

[to Pennington] have emphasized the possible constitutional infirmity in the antitrust laws that a contrary construction would entail in light of the serious threat to First Amendment freedoms that would have been presented."

Other exceptions to this statement are Cantor v. Detroit Edison Co., supra, and National Society of Professional Engineers v. United States, supra.

**18.** See also California Motor Transport Co. v. Trucking Unlimited, supra, 404 U.S. at 517, 92 S.Ct. at 615 (Stewart, J., with whom Brennan, J., joins, concurring in the judgment) (Noerr explicitly holds that the joint exercise of the constitutional right of petition is given immunity from the antitrust laws).

recognition of the constitutional ramifications inherent in prohibiting, or considering as improper, activities such as NOW's boycott. The factors to be considered under section 767 require the recognition of overriding First Amendment freedoms such as the right to petition. We hold that Missouri has no common law tort claim against NOW.

■ We hold today that the Sherman Act does not cover NOW's boycott activities on the basis of the legislative history of the Act and of the Supreme Court's consideration of the legislative history. We hold the same reasoning is applicable to Missouri's Antitrust Act. We hold that NOW's boycott activities are privileged on the basis of the First Amendment right to petition and the Supreme Court's recognition of that important right when it collides with commercial effects of trade restraints. We affirm the trial court's findings and conclusions.

GIBSON, Senior Circuit Judge, dissenting.

Resolution of the unusual and novel issue of law presented by this case will have far-ranging and important consequences on our free and competitive economy and political values because of the fundamental nature of the rights at stake. I cannot agree with the majority's analysis of the issues and application of legal principles, and therefore respectfully dissent.

On appeal, the State of Missouri argues that the District Court's conclusion that the Sherman Act does not apply to NOW's boycott should be overruled because the District Court erred in its application of the *Noerr* exclusion and erred in failing to make the requisite first amendment analysis.[1] I find merit in the State's contentions.

The District Court, ostensibly applying the principles of *Eastern Railway Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), concluded that the NOW boycott would fall outside the scope of the Sherman Act. The court observed that since the convention boycott took place in essentially a political context, and could be characterized as "noncommercial" and "noneconomic,"[2] the "essential dissimilarity" between the convention boycott and those agreements traditionally held violative of section 1 of the Sherman Act was greater in this case than in *Noerr*. Thus, the holding in *Noerr* was considered dispositive of the applicability of the Sherman Act to the NOW boycott. I believe that this is an over-broad interpretation of the *Noerr* case and ignores the basic factual difference between *Noerr* and the present situation of an economic boycott. Most significantly, the District

1. The State of Missouri also argues that certain of the District Court's findings of fact are clearly erroneous, and that the court erred in concluding that the boycott was beyond the scope of the Missouri Antitrust Law and in concluding that the boycott was privileged activity, not actionable in tort under Missouri law. Missouri contends that the factual findings regarding the motivation for the boycott are clearly erroneous because they fail to acknowledge the intention to inflict economic harm. In fact, however, the District Court found that "NOW and the other groups also intended that the adverse economic impact of the boycott on those who would otherwise profit from conventions in Missouri would cause those persons to influence their legislators to support ERA ratification." 467 F.Supp. at 295. Missouri apparently intends to argue that the District Court erred in not according this factor greater weight in determining whether Congress intended the boycott to be subject to antitrust regulation. The latter two arguments primarily involve contentions subsumed in other issues raised, in particular whether the District Court made an appropriate first amendment analysis.

2. These terms are used in the sense defined by Bird, in *Sherman Act Limitations on Noncommercial Concerted Refusals to Deal*, 1970 Duke L.J. 247, 249 (footnote omitted):

A group's purpose will be considered *commercial* if the objective is profit, and the group is composed entirely of businessmen. A group's purpose is *economic* if the objective is the advancement of the group's economic self-interest and is not a commercial purpose as defined above. A group's purpose is *noneconomic* if it has "no substantial content of material self-interest."

Professor Coons initially established this framework in Coons, *Non-Commercial Purpose as a Sherman Act Defense*, 56 NW.U.L.Rev. 705, 708 (1962).

Court practically ignored the critical issue in dispute by merely assuming, without any analysis, that NOW's actions were themselves "an exercise of first amendment rights."[3] The majority opinion follows this same course.

As with any exercise of statutory construction, our first duty is to look to the language of the statute itself. *Lewis v. United States*, —— U.S. ——, ——, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). The comprehensiveness of the Sherman Act[4] has been noted frequently. *E. g., City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 398, 98 S.Ct. 1123, 1129, 55 L.Ed.2d 364 (1978); *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948) ("The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated."); *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 553, 64 S.Ct. 1162, 1173, 88 L.Ed. 1440 (1944). The Supreme Court, however, has cautioned that to ascertain the Act's full meaning or application to concrete situations, we must resort to examination of "the purpose, the subject matter, the context and the legislative history of the statute," *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), and the Rule of Reason,[5] *National Society of Professional Engineers v. United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

The Supreme Court has held that there is a presumption against implied exclusions to the antitrust laws. *City of Lafayette v. Louisiana Power & Light Co., supra*, 435 U.S. at 399, 98 S.Ct. at 1129. The court has recognized only two categories of exclusions, the *Parker v. Brown* state action exclusion and the *Noerr* exclusion, and has stated that even where the fundamental policies underlying these exclusions are implicated, antitrust enforcement will not be precluded unless it would severely impinge upon fundamental policies. The Court explained: "Congress, exercising the full extent of its constitutional power, sought to establish a regime of competition as the fundamental principle governing commerce in this country." 435 U.S. at 398, 98 S.Ct. at 1129 (footnotes omitted). *See also California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, —— U.S. ——, ——, 100 S.Ct. 937, 944, 63 L.Ed.2d 233 (1980). The Court elucidated the fundamental and overarching policies of the antitrust laws by emphasizing the purpose to

---

3. The District Court states: "[T]he issue in this case * * * is whether NOW's actions, which are themselves an exercise of first amendment rights, constitute a violation of the Sherman Act." 467 F.Supp. 289, 304 (E.D.Mo. 1979) (footnote omitted). Indeed, this formulation of the issue would almost seem rhetorical. Obviously, first amendment protected activities cannot be outlawed by Congress.

4. The Sherman Act, 15 U.S.C. § 1 (1976), provides in relevant part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony * * *.

The State of Missouri brings this action solely for injunctive relief pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26 (1976), which provides in relevant part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by violation of the antitrust laws * * *.

5. The Rule of Reason has been used to illuminate the true meaning of the first and second sections of the Sherman Act. *Standard Oil Co., supra*, 221 U.S. at 49, 31 S.Ct. at 511. It resorts to common-law traditions to define unreasonable restraints of trade and includes all restraints which new times and economic conditions render unreasonable. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 211, 79 S.Ct. 705, 708, 3 L.Ed.2d 741 (1959). It is important to note that this established test to define the bounds of antitrust regulation focuses solely upon economic injury to the extent that "the inquiry is confined to a consideration of impact on competitive conditions." *National Society of Professional Engineers v. United States, supra*, 435 U.S at 690, 98 S.Ct. at 1364 (footnote omitted).

eradicate "the potential of serious distortion of the rational and efficient allocation of resources, and the efficiency of free markets which the regime of competition embodied in the antitrust laws is thought to engender," 435 U.S. at 408, 98 S.Ct. at 1134 (footnote omitted), and observed that economic choices counselled solely by parochial interests without regard to their anticompetitive effects would introduce a serious chink in the armor of antitrust protection and be at odds with the comprehensive national policy established by Congress to promote free market competition.[6]  *Id.*

In *Lafayette*, the Court explained the *Noerr* decision on the basis that a contrary construction would have been a threat to the constitutionally protected right of petition, and would impede the open communication between the polity and its lawmakers which is vital to the functioning of a representative democracy. 435 U.S. at 399, 98 S.Ct. at 1129. In order to show an exclusion from antitrust enforcement, the Court stated that it is necessary to demonstrate "countervailing policies which are sufficiently weighty to overcome the presumption." 435 U.S. at 400, 98 S.Ct. at 1130.

The majority does not directly address Missouri's arguments on appeal but rather, through a generalized study, seeks to show that the District Court was correct in concluding that the NOW boycott falls outside the scope of the Sherman Act. The majority's analysis, however, inadequately balances the competing interests. An appropriate analysis of the issue in this case requires careful consideration of whether the convention boycott constitutes constitutionally protected activity under the first amendment; otherwise it must fall within the proscriptions of the antitrust laws as an obvious concerted action to restrain trade and inflict economic harm. Both the District Court and the majority appear to have resolved this issue simply on the basis that NOW's motivation in instituting the boycott was to influence ratification by the Missouri Legislature of the proposed Equal Rights Amendment (ERA). This resolution insufficiently addresses the critical balancing necessary because it virtually ignores the anticompetitive and disruptive effect of the adverse economic impact of NOW's conduct and fails to acknowledge government's legitimate interest in protecting and regulating interstate commerce[7] and in maintaining a competitive economy.

The majority apparently acknowledges that a political boycott can have the same effect upon competition as a commercial boycott, and also recognizes that the legislative history of the Sherman Act does not provide an answer to the question of whether Congress intended to protect competition from the adverse effects of politically motivated economic restraints. *Ante* at 1305. The majority's review of the legislative history merely reveals an absence of any stated affirmative intent to provide coverage. Their review of case law similarly simply led to a conclusion that there was a lack of an affirmative indication that politically motivated, economic boycotts are covered by the Act.[8]  *Ante* at 1309. Without

---

6. *See also United States v. Topco Associates, Inc.*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972), stating:

Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster.

7. *See* U.S.Const., art. I, § 8, cl. 3.

8. In reaching this conclusion, the majority rejected the implication of coverage that can be derived from the numerous references to the comprehensiveness of the statutory language and the emphasis upon protecting against economic injury to victims of restraints of trade and from anticompetitive effects. In *Apex Hosiery Co. v. Leader*, 310 U.S. 469 at 506–07, 60 S.Ct. 982 at 999, 84 L.Ed. 1311, the Court noted "[t]hat the objective of the restraint in the boycott cases  *  *  *  was thought to be immaterial because the Court viewed the restraint itself  *  *  *  to be of a kind regarded as offensive at common law because of its effect in curtailing a free market and it was held to offend against the Sherman Act because it effected and was aimed at suppression of compe-

greater support, NOW's exclusion defense must surely be rejected in view of the presumption against implied exclusions, *City of Lafayette v. Louisiana Power & Light Co.,* *supra,* 435 U.S. at 399, 98 S.Ct. at 1129, and the comprehensive language of the Act, the literal terms of which clearly encompass NOW's activities.

Thus, the majority returns to *Noerr* for guidance and concludes that because NOW's conduct was motivated by the purpose of influencing the passage of legislation, the conduct implicated the right to petition government for redress of grievances,[9] raising important constitutional questions, and was essentially dissimilar to conduct traditionally condemned by the Sherman Act[10] and that therefore NOW's conduct falls without the bounds of antitrust regulation. Unfortunately, the majority does not directly address the important constitutional questions raised, finding that their simple emergence suffices to resolve the question of antitrust coverage. Furthermore, the majority deems "superficial" the *Noerr* Court's clear attempt to distinguish the railroads' publicity campaign from the situation of a direct concert-

ed refusal to deal, *Noerr, supra,* 365 U.S. at 136, 81 S.Ct. at 528. *Ante* at 1314.

While the majority finds that "the crux of the issue is that NOW was politically motivated to use a boycott," *ante* at 1314, Missouri contends that the focus must be upon the use of the boycott, *not* its motivation, because the antitrust laws are designed to protect against the anticompetitive effect of restraints of trade inherent in a boycott, regardless of its motivation. Although the majority seeks to dismiss this effect by characterizing it as "incidental" and portraying the context of the boycott as a "noncompetitive political arena," *ante* at 1315, the congressional intent to preserve and foster free market competition cannot be summarily dismissed or ignored. The arena may not be economically competitive with regard to NOW, and NOW may not have economic interests at stake in this controversy, but the boycott severely affects the competitive posture of Missouri convention interests and the overall economic welfare of Missouri residents. Thus, the technical characterization of the boycott as noncommercial and noneconomic is misleading[11] and actually erroneous in

tition * * *." Other cases have focused upon the injury to individual businesses from restraints of trade and extrapolated from this the injury to free enterprise in the market system as a whole. *See Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 659, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959); *Paramount Famous Lasky Corp. v. United States,* 282 U.S. 30, 42–43, 51 S.Ct. 42, 44–45, 75 L.Ed. 145 (1930).

9. The first amendment to the United States Constitution states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

10. The District Court premised its conclusion that NOW's activities were more dissimilar to traditional restraints of trade found violative of the Sherman Act than the activities in *Noerr* on the difference between the subject matter of the legislation desired. The railroads sought the passage of legislation which would have

placed their competitors at an economic disadvantage whereas NOW sought the passage of legislation to support a social goal. This type of analysis poses the threat of judicial interference in matters outside the scope of judicial review and was disapproved in *Noerr.* 365 U.S. at 139, 81 S.Ct. at 530. The relative merits or character of lobbying goals is irrelevant to judicial consideration of whether the manner in which lobbying may be regulated. "The Sherman Act, moreover, is not an invitation to de novo judgments by courts as to the desirability of the goals sought to be achieved by anticompetitive practices." Note, *"Political" Blacklisting in the Motion Picture Industry: A Sherman Act Violation,* 74 Yale L.J. 567, 579 (1965).

11. *See* note 2, *supra.* These motivation classifications do not attempt to delineate the anticompetitive effect of the conduct described by them. They may, however, aid an evaluation of first amendment claims and a determination of whether the interaction of the boycotters is sufficient to find a combination or conspiracy. Great economic injury and interference with free market competition can result from a boycott, regardless of its motivation. *See* Bird, *supra,* note 2, 1970 Duke L.J. at 261. In a sense, "it would be hard to say that any boy-

important respects. The anticompetitive economic and commercial effects of the boycott on Missouri's legitimate business interests and welfare are identical, regardless of whether the motivation for the boycott is political or economic. The majority thus places the court's imprimatur upon a boycott with potentially severe economic and commercial consequences simply on the basis of the boycott's motivation. The precedential support for drawing this distinction is tenuous at best.

The majority explicitly states: "[W]e do not rest our decision in this case upon the basis that the boycott was noncommercial and non-economic. Our decision is based upon the right to use political activities to petition the government, as was the underlying factor in *Noerr*." *Ante* at 1315, n.16. The majority holding is thus conceived as supported or commanded by the *Noerr* decision. *Noerr* held that concerted publicity to influence favorable legislative activity harmful in some respects to others was protected by the first amendment and not violative of the antitrust laws. It dealt with the situation of a publicity campaign to influence legislative action; there was no refusal to deal in *Noerr*, nor was any economic boycott involved.

The case at issue is considerably different. As Missouri succinctly states: "The *Noerr* case was a combination to get legislation harmful to others. The NOW case is a combination to harm others to get legislation * * *." Unlike the infliction of some direct injury in *Noerr*, the direct economic injury to Missouri is not an incidental effect of the tool used to influence government action; the injury itself constitutes the tool used.[12] Unlike the pure publicity campaign of *Noerr*, NOW went beyond providing the public and legislators with information (however reliable), and actively induced and combined with others[13] to boycott a specific, identifiable segment of a highly competitive industry, the convention

cott is purely non-commercial in character. No matter what the ultimate aim of the combination, a boycott generally involves the infliction of some commercial harm upon the person the combination is trying to coerce into changing his ways." Note, *Use of Economic Sanctions by Private Groups: Illegality Under the Sherman Act,* 30 U.Chi.L.Rev. 171, 174 (1962). *See also* Kestenbaum, *The Antitrust Challenge to the Arab Boycott: Per Se Theory, Middle East Politics, and United States v. Bechtel Corporation,* 54 Tex.L.Rev. 1411 (1976); Note, *supra* note 10, 74 Yale L.J. 567 (1965).

12. In *Noerr,* the Court stated: "Insofar as that Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category of political activity." 365 U.S. at 140–41, 81 S.Ct. at 531. This statement does not control the disposition of the case before us, but rather leaves open the issue of whether a trade restraint intended as a political communication should be condemned under the Act. The Court's reference to the railroads' use of the third-party technique in *Noerr* does not present an analogous circumstance to NOW's use of a boycott. The third-party technique was challenged only on the basis that it apparently involved unethical business conduct, not because it created a separate economic tool that could be considered a restraint of trade.

13. We note that nothing in the antitrust laws would prohibit NOW or other organizations from individually resolving to boycott states that have ·not passed the ERA and then publicizing their resolution. "The illegality consists, not in the separate action of each, but in the conspiracy and combination of all to prevent any of them from dealing with the [victim]." *Binderup v. Pathe Exchange, Inc.,* 263 U.S. 291, 312, 44 S.Ct. 96, 100, 68 L.Ed. 308 (1923).

The Supreme Court recently confronted this distinction between individual and collective action in *Brown v. Glines,* —— U.S. ——, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). *Brown* involved the first amendment right to petition for redress of grievances even more directly than the case at bar. In reviewing military regulations that unquestionably impinge upon conduct involving first amendment rights (solicitation of signatures on and circulation of petitions to members of Congress), the Court balanced the first amendment interests with the "substantial government interest unrelated to the suppression of free expression" sought to be protected by the regulations (military effectiveness). —— U.S. at ——, 100 S.Ct. at 599, 62 L.Ed.2d at 547. Although forwarding individual communications to Congress was not restricted, group petitioning was distinguished and held to warrant special restrictions on free expression as reasonably necessary to promote the substantial government interest.

industry in states that had not ratified the ERA.

These factual distinctions between *Noerr* and the case at bar mandate that the court in this case undertake a more comprehensive balancing of the important governmental interest in preserving the free enterprise system with the interest of people to use this particular method of influencing legislation.[14] *Noerr* simply does not imply the conclusion that the first amendment immunizes politically motivated boycotts against antitrust attack.[15] This brings us back to the crucial question of whether, upon balancing the first amendment interests of NOW with the substantial and important governmental interests embodied in the antitrust laws, the politically motivated economic boycott falls within the ambit of the antitrust laws or is constitutionally protected by the first amendment.

This formulation of the critical issue involved herein leads the court into the delicate and complicated area of first amendment law concerning communicative conduct.[16] While I can well appreciate the majority's reluctance to attack these sensitive issues, I feel it is necessary to assure consistent evaluation of similar claims[17]

14. It is difficult to determine where to draw the line in balancing the various interests, and while it is easy to conclude that political action should not immunize from antitrust attack behavior that is "unnecessarily harmful" to competition, devising a standard to implement the appropriate balance and take into account all the necessary factors is difficult. One standard proposed is:

Behavior is "unnecessarily harmful" to competition when it is excessively dangerous without being indispensable to the political activity. Analysis of whether conduct is indispensable to the political activity depends upon (1) the severity of the danger to competition, (2) the availability of a less dangerous alternative, and (3) the customary political character of the challenged behavior.

Book Review, 11 Rut.-Cam.L.J. 19, 23 n.36 (1979) (citations omitted), restating the standard proposed in 1 Areeda & Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶¶ 201–06 (1978). *See also American Communications Assn. v. Douds*, 339 U.S. 382, 397, 70 S.Ct. 674, 683, 94 L.Ed. 925 (1950) (no absolutist test in weighing when harmful conduct and substantial interests of society can justify restrictions upon speech).

15. The Supreme Court has previously encountered cases where first amendment interests must give way to antitrust enforcement. In *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949), the Court confronted a conflict between first amendment rights of peaceful picketers and the state's valid interest in forbidding agreements in restraint of trade. In rejecting the picketers' argument that their activity was protected dissemination of information, with violation of the state antitrade restraint laws merely incidental, the Court stated: "Such an expansive interpretation of the constitutional guarantees of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to

society." 336 U.S. at 502, 69 S.Ct. at 691. In *National Society of Professional Engineers v. United States, supra*, dealing with the curtailment of first amendment rights of expression on competitive bidding held to be violative of the antitrust laws, the Court held that:

While the resulting order may curtail the exercise of liberties that the Society might otherwise enjoy, that is a necessary and, in cases such as this, unavoidable consequence of the violation. Just as an injunction against price fixing abridges the freedom of businessmen to talk to one another about prices, so too the injunction in this case must restrict the Society's range of expression on the ethics of competitive bidding.

435 U.S. at 697, 98 S.Ct. at 1368.

16. For a comprehensive scholarly examination of the thorny first amendment issue in this case, see Note, *Political Boycott Activity and the First Amendment*, 91 Harv.L.Rev. 630 (1978).

17. The majority's attempt to distinguish this case from *Council of Defense v. International Magazine Co.*, 267 F. 390 (8th Cir. 1920), *ante* at 1304 n.4, and other noncommercial and noneconomic boycott cases, *ante* at 1315 n.16, will not aid reaching a principled disposition of antitrust claims. The difficulty in differentiating political speech from petitioning the government will be great and does not seem warranted by the language of the first amendment, *see* Bird, *supra* note 2, at 288 n.161. In both situations the analysis should reckon with the potential economic disruption produced by the manner of using economic weapons as communication. Furthermore, the *Council of Defense* case simply cannot be distinguished on the basis of an intent to inflict punishment for past actions. The Council evidently believed that Hearst had pro-German sympathies which continued and would continue to bias his reporting. In a sense, the Council's ultimate mo-

and to bring forth all of the factual findings that are relevant to a thorough consideration of each claim. As a single member of the court I hesitate to arrogate to myself the role of endorsing a particular scheme of analysis. Because of the District Court's failure to address the constitutional issue and its failure to accord significant weight to important and substantial governmental interests, I would remand to the District Court with instructions to make further factual findings and apply a balancing analysis to the first amendment issue.

The District Court found as a matter of fact that the activities of NOW would be encompassed within the meaning of the terms "combination or conspiracy" of section 1 of the Sherman Act. 467 F.Supp. at 296. The evidence here conclusively supports this finding, as NOW admittedly induced and solicited the support of other groups.[18] The court below, however, investigated the extent of economic harm that would flow from this concerted refusal to deal only in relation to the issue of standing. It never undertook to balance the disruptive effect upon free market competition with the asserted first amendment

rights, even though the potential economic and competitive injury that can flow from a particular practice is clearly relevant to an evaluation of the importance of the governmental interest in regulating that practice.[19] See note 8 supra. When the interference with first amendment rights is minimal and the governmental interest in regulation is great, the mere presence of some first amendment interest cannot prevent the federal government from exercising its constitutionally granted power to regulate commerce.

The potential chill factor that arises in situations involving first amendment rights, see Bates v. State Bar of Arizona, 433 U.S. 350, 380, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977), heightens the need to engage in a comprehensive and searching evaluation of the issue before us. We are squarely presented with this dispute, cf. Henry v. First National Bank of Clarksdale, 595 F.2d 291, 304 (5th Cir. 1979), and should accept the duty to provide guidance for those desiring to assert their political, moral, or social principles through the use of concerted economic power.

tive could be considered in part a show of support for war-related legislation. Unfortunately, the majority's decision to address this precedent obliquely rather than directly may leave in confusion the basic issue of when economic tools may be used with impunity in pursuit of social and political goals.

18. A recurring and complicated antitrust problem is how to determine the existence of an agreement to restrain trade. See Turner, The Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655 (1962). The District Court applied the legal test articulated in Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226–27, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939), which permits finding a conspiracy without finding any explicit agreement. This test may not generally be appropriate in the circumstance of a noneconomic boycott because the normal assumptions regarding market power and the need for interdependence do not exist. See Bird, supra note 2, 1970 Duke L.J. at 251–52; Kestenbaum, supra note 11, 54 Tex.L.Rev. at 1428. In the situation of a boycott promoted by a group that does not have an economic or commercial motive, it may be desirable to probe more carefully into the interdependent nature of the concerted action and

whether or to what degree coercion, economic or otherwise, as opposed to pure persuasion, is the impetus to the combination. Furthermore, the distinction between acts of concerted refusal to deal and acts of persuasion or inducement may be relevant to a reconciliation of the first amendment and economic interests involved. See Note, supra note 15, 91 Harv.L.Rev. at 687–91.

19. The difference between a primary and secondary boycott is one method of focusing on the potential extent of economic and anticompetitive injury because secondary boycotts have a more extenuated economic impact that direct refusals to deal. See Bird, supra note 2, 1970 Duke L.Rev. at 253; Note, supra note 11, 30 U.Chi.L.Rev. at 178, 181, 190. This distinction has been important in drawing the line between protected and unprotected activity in other noncommercial contexts, see, e. g., Apex Hosiery Co. v. Leader, 310 U.S. 469, 505, 60 S.Ct. 982, 998, 84 L.Ed. 1311 (1940), and might be relevant to the balance to be drawn in this situation. The District Court did not determine whether the convention boycott constituted a primary or secondary boycott.

Because the District Court and the majority fail adequately to address the complex issue of first amendment rights and the government's interest in regulating interstate commerce and promoting free enterprise, I dissent from the majority opinion and would remand to the District Court for an initial determination of the constitutional balancing issue.