CINCINNATI ARTS ASSOCIATION

v.

JONES et al.

2002-Ohio-5428.]

Court of Common Pleas of Ohio,
Hamilton County.

No. A 0202151.

Decided Aug. 26, 2002.

Edward Marks, for plaintiff.

Lucian Bernard, Elise C. Boddie and James L. Cott,[1] for defendants.

THOMAS C. NURRE, Judge.

{¶ 1} This matter came before the court on the defendants' motion to dismiss. The court heard on the record oral arguments on July 22, 2002. The court has reviewed all relevant filings and arguments of all parties involved.

## I. Historical Background

{¶ 2} This matter involves the defendants' boycott against the city of Cincinnati. The defendants have held themselves out under the name of "Coalition for a Just Cincinnati." Before delving into this matter as it relates to the parties before the court, the court finds that it is appropriate to set forth a very brief review of the history that has led up to the issues that are currently before the court. This background, while having no real impact on the actual legal issues before the court, serves only for the purpose of providing a historical foundation and, while socially relevant, is not legally relevant to the matter at hand.

{¶ 3} On April 7, 2001, then Cincinnati Police Officer Steven Roach shot and killed Timothy Thomas. This death initially caused a rise in tensions throughout the Cincinnati area. Two days later on Monday April 9, 2001, a large group of mostly African–Americans appeared before Cincinnati City Council. What began during a three-hour meeting in City Hall eventually turned into protests outside Cincinnati Police Headquarters, during which bottles and rocks were thrown by protesters while officers fired beanbag bullets and deployed irritant gas. By Tuesday April 10, 2001, riots had broken out in downtown Cincinnati. During the riots, many acts of vandalism and violence took place throughout the city of Cincinnati. On April 12, 2001, after three days of violence and vandalism, Cincinnati's Mayor enacted a curfew that lasted from 8 p.m. to 6 a.m. The Mayor also asked for reinforcements from the National Guard to help the Cincinnati police. The curfew remained in effect for four nights. Subsequent to the riots, a number of groups were formed, one of which called itself the Coalition for a Just Cincinnati.

## II. Factual Background as Alleged in the Complaint

{¶ 4} The complaint sets forth the following:

{¶ 5} 1. The Cincinnati Arts Association ("CAA") is an Ohio not-for-profit corporation that operates, among other things, Music Hall, Memorial Hall, and

---

1. The court does not have fax numbers for the NAACP counsel who were admitted pro hac vice and would request that Mr. Bernard please fax copies of this decision to them.

the Aronoff Center for the Arts, all of which are located in Cincinnati. Complaint ¶ 1.

{¶ 6}    2.    The CAA serves as a promoter and producer of some of the productions that take place in its various venues. Complaint ¶ 2.

{¶ 7}    3.    The CAA also rents its facilities to other promoters, producers, and presenters. Complaint ¶ 2.

{¶ 8}    4.    CAA uses the funds derived from the events that it hosts and from the rental activities that it engages in to further its continued existence and also to pay for educational efforts in the Greater Cincinnati Area. Complaint ¶ 3.

{¶ 9}    5.    The named defendants hold themselves out as an organization referred to as the "Coalition for a Just Cincinnati" ("CJC").[2] Complaint ¶ 4.

{¶ 10}    6.    At least defendants Jones and Scott have stated that as a group they "have no beef" with CAA and that they recognize that the CAA engages in activities that seek to include minorities in the CAA's selection of performers and also that the CAA engages in various programs that serve a broad cross-section of the community and its neighborhoods. Complaint ¶ 5.

{¶ 11}    7.    At some point in January 2002, the defendants began a concerted effort to cause economic harm to CAA by, among other acts, sending letters to entertainers around the country urging them not to come to Cincinnati to perform. Complaint ¶ 7.

{¶ 12}    8.    These letters were directed to entertainers that had plans to perform in various CAA venues or to engage in rental activities with the CAA. Complaint ¶ 8.

{¶ 13}    9.    The defendants utilized the Internet, news releases, and further letters to dissuade other entertainers from performing in Cincinnati. Complaint ¶ 9.

{¶ 14}    10.    "The defendants intended, by their actions, to create a boycott of CAA by persuading entertainers either not to enter contracts with CAA, or not to honor existing contracts with CAA *in an effort to punish the City of Cincinnati* for what defendants stated they perceived to be wrongs committed by the City of Cincinnati against them and against African Americans and other minority groups generally.    CAA is a third party and not accused by Defendants of committing such wrongs." (Emphasis added.) Complaint ¶ 10.

---

2.    The complaint also states that this organization has no legal status as an entity under Ohio law but is merely an alias identity for a group of people. Complaint ¶ 4. Since the filing of the complaint, as was brought forth during oral arguments, such an entity has been formed since. Transcript of July 22, 2002 Proceedings, at 15. The existence or non-existence of the CJC as a legal entity has no bearing on the outcome of this matter.

{¶ 15}   11.   Defendants' actions have caused financial harm to CAA. Complaint ¶ 11–17.

{¶ 16}   12.   Defendants' actions have caused Bill Cosby, Wynton Marsalis, The Temptations, and The O'Jays not to perform in CAA venues.   Complaint ¶ 12.

{¶ 17}   13.   The CAA fears that the defendants' actions will prevent other entertainers from appearing in CAA venues and from engaging in rental activities.   Complaint ¶ 13.

{¶ 18}   14.   Defendants intend to cause people in the community, including regular CAA patrons, from spending money downtown on entertainment, such as the entertainment provided by the CAA. Complaint ¶ 14.

{¶ 19}   Based upon these facts, the CAA has brought two claims of tortious interference and one claim of civil conspiracy against the defendants.   The CAA has also brought a claim for injunctive relief.

### III.   Motion to Dismiss Standard

{¶ 20}   In the consideration of a motion to dismiss for failure to state a claim, under Civ. R. 12(B)(6), the factual allegations of the complaint must be presumed true and all reasonable inferences drawn in favor of the plaintiff.   See *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 192, 532 N.E.2d 753.   Dismissal by the trial court is appropriate only when it appears beyond doubt from the complaint that no set of facts in support of the claim can be proved entitling the plaintiff to relief.   See *O'Brien v. University Community Tenants Union, Inc.* (1975), 42 Ohio St.2d 242, 71 O.O.2d 223, 327 N.E.2d 753, syllabus.

### Ohio's Free Speech Clause is Interpreted Under the First Amendment to the Constitution of the United States.

{¶ 21}   The defendants base their motion to dismiss upon the free speech guarantees contained within the Ohio Constitution, which reads:

{¶ 22}   "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right;  and no law shall be passed to restrain or abridge the liberty of speech, or of the press.   In all criminal prosecutions for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury, that the matter charged as libelous is true, and was published with good motives, and for justifiable ends, the party shall be acquitted."   Section 11, Article I of the Ohio Constitution.

{¶ 23}   While the language of Ohio's Free Speech Clause differs from that of the language of the First Amendment to the federal

Constitution,[3] Ohio courts look to the First Amendment to interpret Section 11, Article I of the Ohio Constitution. *Eastwood Mall, Inc. v. Slanco* (1994), 68 Ohio St.3d 221, 626 N.E.2d 59. Therefore, it is quite clear that federal case law is appropriately reviewed in questions involving Section 11, Article I.

## IV. Relevant Federal Court Cases

### A. *NAACP v. Claiborne Hardware Company*

{¶ 24} The court will first discuss the matter of *NAACP v. Claiborne Hardware Co.* (1982), 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215. The court will first set forth the background of the case and follow by discussing the holdings of the case. Citations are omitted from the discussion of the background.

{¶ 25} On March 14, 1966, black citizens of Port Gibson, Mississippi, and other areas of Claiborne County presented to their elected officials a list of demands for racial equality and integration. Nineteen specific demands were made. They called for the desegregation of all public schools and public facilities, the hiring of black policemen, public improvements in black residential areas, selection of blacks for jury duty, integration of bus stations so that blacks could use all facilities, and an end to verbal abuse by law enforcement officers. Later, on March 23, two additional demands were made.[4]

{¶ 26} When these demands were not met to their satisfaction, they, along with the NAACP, organized a boycott of all white merchants in the area. The agreement to boycott took place on or about April 1, 1966.

{¶ 27} In September 1966, Mississippi Action for Progress, Inc. ("MAP") was organized to develop community-action programs in a number of Mississippi counties. One of MAP's programs involved the purchasing of food to be provided to young children. Originally, food was purchased in Claiborne County, alternately, from white- and black-owned stores, but in February 1967, MAP decided to purchase food only from black-owned stores. This decision caused great financial burdens on the white-owned stores.

{¶ 28} Several other events took place in 1967 that had effects on the boycott. First, on February 1, 1967, Port Gibson employed its first black policeman, which

---

3. The First Amendment reads as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for redress of grievances." The protections of the First Amendment are protected by the Fourteenth Amendment from invasion by the states. *Edwards v. South Carolina* (1963), 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697.

4. The Supreme Court listed only one of the two additional demands, that being that "[a]ll stores must employ Negro clerks and cashiers."

caused the boycott to be lifted on a number of merchants. However, on April 4, Dr. Martin Luther King, Jr., was assassinated in Memphis. This caused the boycott to be "tightened."

{¶ 29} The next significant event that took place is eerily similar to events that took place in Cincinnati in April 2001. On April 18, 1969, a young black man named Roosevelt Jackson was shot and killed during an encounter with two Port Gibson police officers who had gone to his home to arrest him. A scuffle ensued and Jackson was shot by a white police office while allegedly being held by a black officer. Large crowds immediately gathered, first at the hospital and later at a church. Tension in the community quickly reached "a breaking point." The local police requested reinforcements from the state highway patrol and acts of violence ensued. The mayor and board of aldermen enacted a curfew. On April 19, a NAACP representative led a march to the courthouse, where it was demanded that the entire Port Gibson police force be discharged. When this demand was refused, the boycott was reimposed on all white merchants.

{¶ 30} The Supreme Court noted that, for the most part, the boycott activities were peaceful. Only four exceptions took place that were noted by the Supreme Court over the four years the boycott was in effect.

{¶ 31} The boycotted merchants, on October 31, 1969, filed suit in state court to recover losses caused by the boycott and to enjoin any future boycott activity. The trial court ultimately found that a majority of the named defendants were jointly and severally liable for damages caused to the merchants from the boycott. The trial court also found that the boycott against the merchants was illegal because the defendants' primary dispute was with the governing authorities of Port Gibson and Claiborne County, not with the merchants at whom the boycott had been directed.[5] The trial court rejected all of the defendants' arguments that their conduct was protected under the First Amendment. The trial court awarded the plaintiffs $1,250,699, not inclusive of interest. The trial court also entered a permanent injunction that enjoined the defendants from stationing "store watchers" at the plaintiffs' business premises; from "persuading" any person from withholding his patronage from the plaintiffs; from "using demeaning and obscene language to or about any person" due to that person's continued patronage of the plaintiffs; from "picketing or patrolling" the premises of any of the plaintiffs; and from using violence against any person or inflicting damage to any real property.

{¶ 32} The Mississippi Supreme Court, in December 1980, reversed significant portions of the trial court's ruling. However, it did uphold the imposition of

---

5. The trial court had also found a violation of an antitrust statute, but that is not relevant for the discussion of the matter before this court.

liability on a common-law tort theory. The Mississippi Supreme Court stated that the "stationing of guards ('enforcers,' 'deacons,' or 'black hats') in the vicinity of white-owned businesses" showed that the "volition of many black persons was overcome out of sheer fear, and they were forced and compelled against their personal wills to withhold their trade and business intercourse from the complainants." The Mississippi Supreme Court concluded that the entire boycott was illegal because "of these factors—force, violence, or threats" and that when any of these factors are present the entire "boycott is illegal regardless of whether it is primary, secondary, economical, political, social, or other." The Mississippi Supreme Court, though not specifically identifying the evidence showing a connection between the defendants and any agreement, struck down the boycott under a theory that the boycotters agreed to use force, violence, and threats to effectuate the boycott. The Mississippi Supreme Court remanded the matter to the trial court to recompute damages. The Supreme Court of the United States then granted a petition for certiorari.

{¶ 33} The Supreme Court noted that it was "acknowledged [that the boycott's] purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice," that "[t]he boycott was supported by speeches and nonviolent picketing," and that "[p]articipants repeatedly encouraged others to join in its cause." Id. at 907, 102 S.Ct. 3409, 73 L.Ed.2d 1215. The Supreme Court found that each "of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments." Id. It was further held that the speech used to further the aims of the boycott did "not lose its protected character, however, simply because it may embarrass others or coerce them into action." Id. at 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215, citing Thomas v. Collins (1945), 323 U.S. 516, 537, 65 S.Ct. 315, 89 L.Ed. 430 (" 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts."). The Supreme Court further noted that "[w]hile States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." Claiborne, supra, 458 U.S. at 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215. The Supreme Court ultimately reversed the Mississippi Supreme Court's finding that damages could be imposed due to the boycott's being political speech protected under the First Amendment. In its discussion on the violent acts that took place, the Supreme Court stated that only those loses that were "consequences of violent conduct" were recoverable and that no damages could be awarded for "nonviolent, protected activity." Id. at 918, 102 S.Ct. 3409, 73 L.Ed.2d 1215. The Supreme Court further went on to state that the "First Amendment similarly restricts the ability of the State to impose liability on an individual solely because of his association with another." Id.

### B. *Missouri v. National Organization for Women, Inc.*

{¶ 34}  The court will now set forth the background and holdings of *Missouri v. Natl. Org. for Women, Inc.* (C.A.8, 1980), 620 F.2d 1301, certiorari denied (1980), 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49.  As was done in the discussion of *Claiborne*, the court will omit citations while setting forth the background of the case.

{¶ 35}  The National Organization for Women, Inc. ("NOW") was actively engaged in an economic boycott campaign directed at states that had not ratified the Equal Rights Amendment ("ERA").  In furtherance of this boycott, NOW boycotted the entire state of Missouri, which caused substantial financial harm to business that would normally take place in Missouri due to conventions.  NOW had the intent to do economic harm to the businesses that would benefit from the convention business in order to cause them to put pressure on the state to ratify the ERA.

{¶ 36}  NOW was aware that its boycott would work against the public's economic interests.  NOW, however, was hopeful that its boycott would cause the public interest to suffer to the point that the public would be persuaded that ratification of the ERA was desirable and would, in turn, persuade the Missouri legislature to ratify the ERA.

{¶ 37}  Missouri brought claims against NOW, arguing that NOW's goal was economic in nature and was in violation of a number of federal Acts. Missouri also brought claims against NOW for intentional interference with contracts.

{¶ 38}  The Eighth Circuit Court of Appeals, affirming the trial court, found in favor of NOW. The Eighth Circuit held that the boycott of Missouri was "a publicity campaign to influence governmental action [that] falls clearly into the category of political activity."  Id. at 1312, quoting *E. RR. Presidents Conference v. Noerr Motor Freight, Inc.* (1961), 365 U.S. 127, 140–141, 81 S.Ct. 523, 5 L.Ed.2d 464.  The Eighth Circuit further quoted the following from *Noerr*:

{¶ 39}  "It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed.  * * *  To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns."  *Noerr*, supra, 365 U.S. at 143–144, 81 S.Ct. 523, 5 L.Ed.2d 464.

{¶ 40}  As has been done in the matter before this court, Missouri brought a claim against NOW for interference with contracts under the Restatement of the Law 2d, Torts (1979), Section 766B. A valid defense to interference with contracts under Section 766B is that of justification, which is found in Section 767.  The Eighth Circuit affirmed the trial court's finding that "the right to petition is of

such importance that it is not an improper interference even when exercised by way of a boycott." *Missouri v. NOW*, supra, 620 F.2d at 1317. The Eight Circuit found that "Missouri has no common law tort claim against NOW." Id. at 1319.

## V. Application

{¶ 41} The CAA's first two claims for tortious interference with contract were first recognized in Ohio in 1995. The Ohio Supreme Court adopted the cause of action from the Restatement of the Law 2d, Torts, Section 766. *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 650 N.E.2d 863. The Ohio Supreme Court stated:

{¶ 42} "We too adopt the analysis of the Restatement and hold that in order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Id. at 418, 650 N.E.2d 863.

{¶ 43} The Ohio Supreme Court later reaffirmed *Kenty* and stated "that establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper." *Fred Siegel Co., L.P.A. v. Arter & Hadden* (1999), 85 Ohio St.3d 171, 176, 707 N.E.2d 853.

{¶ 44} The First District Court of Appeals, under which this court sits, has also recognized a cause of action for intentional interference with business relationships. *Elwert v. Pilot Life Ins. Co.* (1991), 77 Ohio App.3d 529, 602 N.E.2d 1219. In *Elwert*, the First District specifically adopted the defense of privilege, as set forth in Section 766 of the Restatement:

{¶ 45} "One is privileged purposely to cause another not to perform a contract, or enter into or continue a business relation, with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction." *Elwert*, supra, 77 Ohio App.3d at 539, 602 N.E.2d 1219.

{¶ 46} For the CAA to prevail, it must be able to prove that the defendants lack justification for the actions that they have taken and likely will continue to take. Defendants cite their rights under Section 11, Article I of the Constitution of Ohio and the First Amendment to the Constitution of the United States. As stated above, Section 11, Article I is interpreted as if it were the First Amendment and for the sake of simplicity will, from this point forth, be referred to simply as the First Amendment. For the defendants to prevail on their motion to dismiss, their speech must be protected under the First Amendment.

{¶ 47} It has been acknowledged by the CAA in its complaint that the purpose of the boycott is "to punish the City of Cincinnati for what defendants stated they perceived to be wrongs committed by the City of Cincinnati against them and against African–Americans and other minority groups generally." Complaint ¶ 10. During oral arguments, this statement was bolstered by the CAA, stating that "the boycott of the City and county governments [seeks] redress of grievances which they perceive to exist." Transcript of July 22, 2002 Proceedings, at 13. At no point in the complaint or during oral arguments has the CAA alleged that the boycott activities have been anything but peaceful.

{¶ 48} Speech that is political expression is granted one of the highest, if not the highest, First Amendment protection. Violence associated with that expression is not afforded any protection. *Claiborne*, supra, 458 U.S. at 918, 102 S.Ct. 3409, 73 L.Ed.2d 1215. The CAA argues that sometimes such speech, however, comes with a "price tag." Transcript of July 22, 2002 Proceedings, at 19. This court simply cannot agree with this argument under these circumstances.

{¶ 49} The CAA attempts to analogize this matter to someone standing outside a drug store making false statements about the druggist in hopes of keeping customers away and to keep suppliers from supplying the druggist. The CAA argued:

{¶ 50} "If I stand in front of, say, a drugstore, and I say that the pharmacist is dealing drugs under the counter, that he's selling outdated prescription drugs, that he's cheating the insurance company, and I say that both in front of the drugstore, where I would be speaking to his customers, and also tell that to his suppliers, the drug wholesalers, I have the right to do that. But I also have the responsibility to pay for the damages that the druggist suffers. That is no different from our situation." Transcript of July 22, 2002 Proceedings, at 20.

{¶ 51} Contrary to what the CAA argued, it is entirely different from our situation. Whereas the hypothetical falls into the realm of slander and libel law, that is not the situation here. While the defendants may be making negative remarks about Cincinnati in their letters and website, they are not making them about the CAA. Here the defendants are advising people not to come to Cincinnati until the city government makes reforms that they feel are necessary. As the CAA stated in its complaint, the defendants have "no beef" with the CAA, whereas their hypothetical shows someone who clearly has some beef with the drugstore.

{¶ 52} Just as no one doubts that the CAA has suffered economic harm here, no one doubts that boycotts generally do economic harm. This was acknowledged by the Supreme Court of the United States in *Claiborne*, where it was

stated that a "nonviolent and totally voluntary boycott may have a disruptive effect on local economic conditions." *Claiborne,* supra, 458 U.S. at 912, 102 S.Ct. 3409, 73 L.Ed.2d 1215. No one doubts that economic harm is often inflicted upon third parties, third parties who may be entirely innocent or even supportive of the goals of the boycott. See *Missouri v. NOW,* supra. As was the case in *Claiborne,* the defendants here seek "to vindicate rights of equality and of freedom that lie at the heart of the Fourteenth Amendment itself." *Claiborne,* supra, 458 U.S. at 914, 102 S.Ct. 3409, 73 L.Ed.2d 1215. The fact that economic injury has taken place "[can]not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself." Id.

{¶ 53} The speech that is contained in the letters that were sent to entertainers, regardless of whether they had an existing contract or not, was directed towards the current affairs taking place in Cincinnati. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government. * * * There is a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Claiborne,* supra, 458 U.S. at 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215, citing *Garrison v. Louisiana* (1964), 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125, and *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686. While this speech may have caused entertainers to cancel their contracts, "[s]peech does not lose its protected character, however, simply because it may * * * coerce [others] into action." *Claiborne,* supra, 458 U.S. at 910, 102 S.Ct. 3409, 73 L.Ed.2d 1215.

{¶ 54} Even when contracts are interfered with by political speech, there is no right to recovery. While this is clear from the requirement of the CAA to show "lack of justification" in their claims, it was also made clear in *United Mine Workers of Am. v. Gibbs* (1966), 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218.

{¶ 55} In *Gibbs,* the United Mine Workers ("UMW") and the Southern Labor Union ("SLU") were in the midst of a rivalry over representation of coal workers. During this time, a coal mine shutdown put 100 Local 5881 miners out of work. During the same year, a subsidiary of the company that closed the mine hired Gibbs as a mine superintendent to attempt to open a new mine on nearby property with help from the SLU. Gibbs also received a contract to haul the mine's coal to the nearest railroad loading point, but when he attempted to open up the mine he was met by armed members of the Local 5881, who threatened Gibbs and beat an SLU organizer. After this one instance of violence a peaceful picket line was maintained for nine months.

{¶ 56} Gibbs lost his position as superintendent and was never able to begin performance of the haulage contract. Gibbs filed suit against the UMW alleging, among other things, "an unlawful conspiracy and an unlawful boycott aimed at

him * * * to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." Id. at 720, 86 S.Ct. 1130, 16 L.Ed.2d 218. The Supreme Court of the United States ruled that "the permissible scope of state remedies in this area is strictly confined to the direct consequences of such [violent] conduct, and does not include consequences resulting from associated peaceful picketing or other union activity." Id. at 729, 86 S.Ct. 1130, 16 L.Ed.2d 218.

{¶ 57} The court is more than aware that a number of citizens in Cincinnati feel that many of the boycott's goals are unrealistic and perhaps insincere. However, this court must note that the CAA has repeatedly acknowledged that the purpose of the defendants' boycott is to influence the government of the city of Cincinnati. Complaint ¶ 5, 10, and 14; Transcript of July 22, 2002 Proceedings, at 13. The court notes that during oral arguments, counsel for the CAA pointed out that "Paragraph 10 of the Complaint, which [defense] counsel just pointed to, alleges that they are boycotting Cincinnati Arts Association, a separate and distinct boycott." This is true, but ¶ 10 also goes on to state that the purpose of any boycott activity directed towards the CAA was engaged in an effort to "punish the City of Cincinnati." Just as was the case in *Missouri v. NOW*, where NOW boycotted the entire state, innocent parties are going to get harmed, often intentionally, in an effort to have stronger voices in the community put pressure upon the government. Members of the community may consider the boycott to be unethical and clearly the boycott has had an economic effect on a number of businesses and individuals beyond just the CAA. However, this does not change the fact that it is still political activity aimed at persuading the government of Cincinnati to take action. The First Amendment, however, was formed to act as a shield not only for popular, but also for unpopular, ideas. It is truly unfortunate that so many innocent parties are harmed by the boycott, most likely including parties that are not only innocent but sympathetic towards and supportive of the boycott's purpose. Despite this unfortunate harm done to innocents, the boycott activities, which have caused injury to the CAA, are political activity that is given First Amendment Protection and, based upon the complaint filed in this matter, the CAA cannot prove any set of facts that will show otherwise. Therefore, the CAA cannot show that the defendants lacked justification, and their claims for tortious interference must fail.

■ {¶ 58} As to the claim for civil conspiracy, while "[t]here are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." *Citizens Against Rent Control Coalition for Fair Housing v. Berkeley* (1981), 454 U.S. 290, 296, 102 S.Ct. 434, 70 L.Ed.2d 492. This court has found that the acts engaged in by the

defendants were political expression. The claim for civil conspiracy must also fail.

{¶ 59} Because of the political speech involved, it would be unconstitutional for this court to order any injunctive relief; therefore, the claim for injunctive relief must fail.

■■ {¶ 60} The court will note that the CAA included in its complaint that the defendants "had no justification to take such actions against CAA, and took such actions with actual malice, as that term is defined in Ohio law." Complaint ¶ 18. While the court is bound to take factual matters in the complaint as being true, the same does not hold for legal conclusions. Unsupported legal conclusions are not sufficient to withstand a motion to dismiss. *Mitchell v. Lawson Milk Co.* (1988), 40 Ohio St.3d 190, 193, 532 N.E.2d 753; *Schulman v. Cleveland* (1972), 30 Ohio St.2d 196, 59 O.O.2d 196, 283 N.E.2d 175. The complaint itself undermines the statement, as shown above, by all but going out and saying that the defendants engaged in political speech.

## VI.   Recent Events in Cincinnati

{¶ 61} This court would be lax in its duties generally toward the public if it did not address at least one recent event that took place in Cincinnati. On both August 17 and 18, 2002, violence erupted in downtown Cincinnati after the Black Family Reunion. The violence, according to newspaper reports, was engaged in by mainly African–American youths. Without a doubt, such acts mar the efforts made by others (boycotters, governmental, or otherwise) to bring about harmony in Cincinnati.

{¶ 62} Even if those who did engage in the acts of violence were related to the CJC, their activities would not remove the political nature of the boycott itself. In *Claiborne*, the Supreme Court of the United States cited a number of instances of violence engaged in by the boycotters and noted that those who engaged in such acts, but not the organization or group that sought political and not violent ends, were liable for the harm they caused. The "First Amendment similarly restricts * * * liability on an individual solely because of his association with another." *Claiborne*, supra, 458 U.S. at 918–919, 102 S.Ct. 3409, 73 L.Ed.2d 1215. Thus, even if some of those who engaged in the recent violence were members of, associated with, or supported the defendants in this matter, it would be entirely improper and unconstitutional for this court to consider their violent acts in rendering this decision.

## VII.   Conclusion

{¶ 63} The court finds that under First Amendment precedent, the activities engaged in by the defendants are political speech that is afforded constitutional

protection. Therefore, the acts of the defendants are justified, and the court finds the motion to dismiss to be well taken and hereby grants the same. While the court cannot readily foresee how the CAA can overcome[6] the constitutional protections afforded to the defendants, the court will make this dismissal, as is proper to do with any dismissal under Civ.R. 12(B)(6), without prejudice.

{¶ 64} The court will once again emphasize what it has told other parties and what the CAA stated during oral arguments, that being that "the courtroom is the last place to go to resolve a dispute." Transcript of July 22, 2002 Proceedings, at 36. As the court noted during oral arguments, this case will most certainly be appealed. The foregoing statement applies to trial courtrooms as well as appellate courtrooms.

{¶ 65} The court encourages the defendants to realize that while they have won this battle and, in presuming that this court is not ultimately reversed, will win any future legal battles, they are losing what appears to be a strong ally. The CAA engages in activities that are designed to benefit the community as a whole, especially through educational programs for children. It is true that, for better or worse, the CAA's venues are located within the targeted area of the boycott. It is also true that entertainers that come into downtown Cincinnati will bring more tax dollars into the city. However, it is also true that the CAA gives money it earns towards the education of children of the communities both inside and outside the boycotted area.

{¶ 66} The court cannot emphasize how much it hopes and desires for these parties to find a solution where they can work together towards mutual goals. By hurting the CAA, the boycotters are hurting programs the CAA designed that benefit the boycotters' own communities. Dr. Martin Luther King Jr. wrote in "Why We Can't Wait" that nonviolent activity, such as that engaged in here, is a "sword that heals."

{¶ 67} Whether or not one describes the activities engaged in by the defendants as "healing," the defendants need to realize that they are wielding a powerful weapon that can most certainly cause substantial, perhaps irreparable, harm to those who seek to actually heal the city. Who, after all, is really being harmed by the boycott here? A nonprofit organization that actively attempts to better the entire downtown community, not just the area targeted by the boycott.

{¶ 68} Just recently the NAACP, the leaders of the boycotts in *Claiborne*, had planned to hold a dinner in downtown Cincinnati. The CJC pressured it into

---

6. Perhaps if, as the court has assumed for the purposes of this motion, contracts did exist with the various entertainers who chose not to perform in CAA venues, the CAA could bring breach-of-contract actions against them. The court is, however, aware that the practical effects of such suits may do more harm than good to the CAA.

doing otherwise. It should go without saying that the NAACP has been one of the leaders in the forefront in establishing civil rights and for healing areas where civil rights problems. exist. Instead of seeing the NAACP striving to heal, however, the CJC instead accused it of associating with "the enemy." The court certainly does not fault the NAACP for making the decision to move its dinner out of the city, as it was clearly placed in a very difficult position and did what it felt was best. The court is not willing to say the same about the CJC in this instance.

{¶ 69} If it has not become apparent by now, the court is not exactly pleased with the outcome of this suit. A truly innocent party has been injured and there is nothing that the court can do to remedy the situation. The results, however, are those mandated by the Constitutions of both the United States and the state of Ohio. Both Constitutions provide to all of us the rights that have made this country what it is today. The court is fully aware that to hold otherwise would have a chilling effect on free speech that cannot be tolerated under our great and cherished system of government.

{¶ 70} The First Amendment gives to the citizens of the United States an awesome power that is often taken for granted. That power can be rightfully used for a number of purposes, often purposes that a majority of our society finds distasteful. If anything, the framers of the Constitution wanted always to ensure that the free exchange of ideas would exist in this country, especially when those ideas were not popular. For example, the court sincerely doubts that any decent person wanted the KKK's placing a cross on Fountain Square a few years ago, but the First Amendment allowed it. The court has read the emails that have been sent to the CJC, which were attached to affidavits submitted to the court, but not filed, in response to a now-moot motion to compel. No decent person can look at these emails and support the derogatory nature of the words, but at the same time no decent citizen of the United States would take away the First Amendment right for these people to express their opinions. While the language employed in a number of the emails was offensive to decent people, the First Amendment allows it. The court sincerely doubts that many citizens of the United States would support the overthrow of the government, but those who do may express their views because the First Amendment allows it. For the same reason that the KKK was able to place a cross on Fountain Square, that our citizens can join parties that seek the overthrow of the government, that each of us can express our opinions and desires to our government, that opponents of the boycott can speak against it, the defendants may legally engage in their boycott— the First Amendment allows it.

{¶ 71} The court, over the past three decades on the bench, has seen thousands of cases settle. A nearly universal theme that runs throughout almost

every settlement is that no party ever walks away getting everything it wants. Both sides give and take in moving towards settlement. Giving and taking is part of the process of traveling down the road towards resolution.

{¶ 72} The court has no doubt that civil rights problems exist within this and other communities throughout the United States. The court does not doubt that many good people truly wish to solve these problems and to heal the communities that have been injured. The court hopes that those wielding the sword of the boycott realize that it very well may be a double-edged sword upon which they can (or perhaps already have) cut themselves and their supporters very badly.

Motion to dismiss granted.